Ross L. REED and Margaret D. Reed, his
wife, Appellants and Cross-Appel-
lees (Defendants below),

v.

Glen T. WADSWORTH and Fay T. Wads-
worth, his wife, Appellees and Cross-
Appellees (Defendants below),

v.

H. R. WAGSTAFF and Evelyn Wagstaff, his
wife, Appellees and Cross-Appel-
lants (Plaintiffs below).

Nos. 4550, 4551.

Supreme Court of Wyoming.

Sept. 9, 1976.

Glenn Parker, Hirst & Applegate, Cheyenne, submitted briefs and appeared in oral

argument with Doug Madison, Hirst & Applegate, Cheyenne, for appellants-cross-appellees-Reed.

Robert S. Campbell, Jr. and Robert D. Maack, Watkiss & Campbell, Salt Lake City, Utah, and John D. Troughton, Kemmerer, submitted briefs and Robert S. Campbell Jr., Salt Lake City and John D. Troughton, Kemmerer, appeared in oral argument for appellees-cross-appellants-Wagstaff.

Gary M. Greenhalgh, Greenhalgh & Bussart, Rock Springs, submitted brief and appeared in oral argument for cross-appellees-Wadsworth.

Before GUTHRIE, C. J., and McCLINTOCK, RAPER, THOMAS and ROSE, JJ.

RAPER, Justice.

This appeal involves issues arising out of a claim by the buyers, Wagstaffs, of breach of a real estate contract by the sellers, Reeds, and a specific performance claim by the buyers as against subsequent purchasers, the Wadsworths. The trial was before the district court without a jury. The trial judge awarded $213,350.00 damages, as alternative relief to plaintiffs-appellees-cross-appellants Wagstaffs for breach of contract by defendants-appellants-cross-appellees Reeds, and denied specific performance as against defendants - cross - appellees Wadsworths. The validity of the land sales contract is the principal question. We will affirm the trial court.

With what has become tedious repetition, we remind the parties that we must assume that evidence in favor of the successful party is true, leave out of consideration entirely evidence of an unsuccessful party in conflict therewith and give to the evidence of the successful party every favorable inference which may be reasonably and fairly drawn from it. *Tavares v. Horstman,* 1975, 542 P.2d 1275, 1277, and the references there footnoted. We have been aided by the trial judge in this case in that he has made specific findings of fact related to the breach of contract by the

Reeds. We are bound thereby and it would be improper for us to substitute our judgment for those findings; they are conclusive if supported by evidentiary facts and will not be disturbed on appeal. *Wyoming Farm Bureau Mutual Insurance Company v. May,* Wyo.1967, 434 P.2d 507, 511. See also Key No. 1010(1), Appeal and Error, 1 West's Wyoming Digest. With respect to the Wadsworths, the trial court made only general findings. In the absence of special findings of fact, the reviewing court must consider that a judgment carries with it every finding of fact which is supported by the evidence. *Peters Grazing Association v. Legerski,* Wyo.1975, 544 P.2d 449, 455, reh. den. 546 P.2d 189.

As the facts are outlined and mentioned in this opinion, those general appellate principles must be kept in mind because they will favor the prevailing parties, unless the contrary is noted. We shall accept the facts as stated by the appellees, when in conformity with the record, and supplement them from our own examination of the transcript of testimony, the exhibits, the trial judge's findings of fact and other parts of the district court file. While lengthy, we feel obliged to set out in some detail the surrounding circumstances because they fortify and justify our conclusions that a meaningful and valid contract was entered into between the parties.

The Wagstaffs, Utah residents, had a desire to purchase a ranch. Their inclinations took them into nearby Uinta County where in August, 1970, an inquiry at a service station about ranches for sale in the area directed them to the Reeds. They drove to the place, met Mr. Reed for the first time, whom they found working in a field. He advised the 7,000-acre ranch was for sale, had been listed for $450,000.00, but if he did not have to pay a realtor's fee, might accept a lesser amount. No proposal to purchase was made at that time. In the fall of 1970, the Wagstaffs, by letter, offered $300,000.00 to the Reeds. There was response to a follow-up letter, when in

early March, 1971, Reed telephoned Mr. Wagstaff and asked him to come to Lyman, Wyoming, to negotiate a purchase and sale. At the meeting which followed, Wagstaff offered $350,000.00 on specified terms. Mr. Reed, by telephone, on March 15, 1971, told Wagstaff he intended to accept that offer. Later, however, Mrs. Reed told Wagstaff that while they intended to accept the offer, it would not include baled hay on the property or the farm and ranch equipment.

Wagstaff had his lawyer prepare a contract of sale in accordance with the negotiations. The Wagstaffs then drove to the office of the Reeds' lawyer in Evanston. The contract form was examined by the Reeds and their attorney. An additional paragraph and addendum were provided by the Reeds' counsel and signed by the parties in the changed form. No final date for closing was discussed or fixed at that time.

Generally, it provided for: an advance payment of $10,000.00, which the Wagstaffs paid to the Reeds at the time of execution (the check was negotiated three days later); the land was described by reference and the minerals were reserved in sellers; the purchase price was $350,000.00, $10,000.00 of which was represented by the deposit, $90,000.00 to be paid on delivery of a formal contract of sale, balance payable at the rate of $12,500.00 annually with 6% interest on the unpaid balance, commencing December 30, 1972. The sale included a reservoir, all water rights and BLM grazing permits and was subject to a mortgage to Travelers Insurance Company; taxes were to be prorated as of the date of possession; buyers to receive the sellers' share of 1971 crops and all unbaled hay on the premises; sellers to furnish abstracts and merchantable title, bank the earnest money for release to sellers on acceptance of title and place a deed in escrow. The earnest money receipt and final agreement were to be unassignable without consent; the residence to be insured; a grace period of 30 days for payments to be provided; and grazing permits to remain in sellers through the 1972 grazing season. A more formal agreement was contemplated.[1]

---

1. The agreement bears no descriptive title. With parts we have omitted noted, it is as follows:
"I hand you herewith the sum of TEN THOUSAND AND NO/100 ($10,000.00) DOLLARS to secure and apply on the purchase of a certain ranch property in Uinta County, State of Wyoming, as more particularly described in a certain mortgage dated September 1, 1965 from Ross L. Reed and wife to Travelers' [sic] Insurance Company, said mortgage being recorded in Book 260 at Page 75 in the Office of the County Recorder of Uinta County, State of Wyoming. Excepting and reserving unto Sellers all oil, gas and other minerals and mineral rights in, upon, or underlying said property above described.
"The total purchase price shall be THREE HUNDRED FIFTY THOUSAND AND NO/100 ($350,000.00) DOLLARS payable as follows: $10,000.00 which represents the above mentioned deposit, receipt of which is hereby acknowledged; $90,000.00 upon delivery of the contract of sale; and the balance of $250,000.00 payable on contract, $12,500.00 annually on or before December 30 of each year commencing December 30, 1972, plus interest at 6% per annum on the unpaid balance, interest to run from the date of possession.

"It is expressly understood and agreed that there is included in the sale of the above described real property the Reed Reservoir together with all ditches, canals or rights of way appurtenant to said reservoir or necessary to the use of the water and water rights, specifically including all water rights used on the above described real property, including but not being limited to the following permits issued by the State Engineer of the State of Wyoming:
[Described in original.]
together also with the following certificates of appropriation:
[Shown by number in original.]
"It is understood that title to the above described premises is subject to the mortgage in favor of the Travelers' [sic] Insurance Company referred to above which said mortgage is payable at the rate of $10,000.00 per year, plus interest at the rate of 5-¾% per annum, the balance unpaid on said mortgage being $150,000.00 with the payment due January 1, 1971 having been made. It is further expressly understood that title is subject to the rights of Howard Brinton under an oral share cropping agreement.
"It is expressly understood that there is included in the sale all licenses or permits issued by the Bureau of Land Management

The Reeds deposited, by banking, the $10,000.00, as agreed, and delivered the abstracts to the Wagstaffs, which were approved. Upon approval, Mr. Wagstaff directed his attorney to prepare the implementing documents for closing the sale.

Mr. Reed made various attempts to induce and encourage the Wagstaffs to cancel the contract. On one occasion, he called Mr. Wagstaff to tell him the basement of the home flooded when it rained and he would hire, at the Wagstaffs' expense,

to the seller for use in connection with the real property described above and for which said real property is the base. The seller will execute all necessary documents to effect a transfer of the Bureau of Land Management permits to the buyer.

"Taxes are to be pro-rated as of the date of possession, and the buyer is to receive the seller's share of the 1971 crops grown on the premises and the buyer is also to receive all unbaled hay which is stacked on the premises.

"Upon acceptance of this offer by the seller, the seller shall cause abstracts of title to be brought to date and agrees to furnish a marketable title. The abstracts are to be delivered to the purchaser's attorney as soon as continued to current date, and when the title has been accepted, the final contract of sale shall be prepared and will show the names of the buyers as H. R. WAGSTAFF and EVELYN WAGSTAFF, his wife, as joint tenants.

"Upon acceptance of this offer, it is expressly understood and agreed that the earnest money shall be deposited with the First National Bank of Evanston, Wyoming, to be released to the seller upon approval of title and execution of the final contract of sale, and if for any reason the seller fails, refuses or neglects to have the abstracts of title continued or do any other things necessary or requisite for the preparation of the final contract of sale and other sales documents, upon demand the earnest money will be returned to the buyer.

"It is further expressly understood and agreed that the seller will deposit the contract of sale with the First National Bank of Evanston, Wyoming, together with an executed conveyance of title to the property with appropriate instructions that said conveyance is to be delivered to the buyers upon compliance with all of the terms, covenants and conditions of the contract of sale, and the seller covenants and agrees to execute and deliver concurrently with the contract of sale, all documents necessary to effect a transfer of the Bureau of Land Management permits and grazing rights to the purchasers.

"DATED this 27th day of April, 1971.

/s/ H. R. Wagstaff

H. R. WAGSTAFF

"I hereby accept the foregoing offer and agree to be bound by all of the terms, covenants and conditions thereof.

"DATED April 27, 1971.

/s/ Ross L. Reed

ROSS L. REED
/s/ Margaret D. Reed

"ADDENDUM

"This addendum is hereby made part of that certain earnest money receipt dated April 27, 1971, made and executed by and between H. R. Wagstaff as Buyer and Ross L. Reed and Margaret D. Reed, his wife as Sellers:

"IT IS FURTHER EXPRESSLY UNDERSTOOD AS FOLLOWS:

"1. That neither said earnest money receipt nor the formal contract of sale shall be assigned by either party except upon mutual written consent.

"2. That Buyer will upon delivery of the formal contract of sale secure a policy of insurance insuring the residence home located upon said property against loss by fire and with extended coverage for the sum of $25,000.00 and said policy of insurance shall contain a clause making loss payable to both parties in accordance with their respective interests.

"3. That said formal contract of sale shall contain a grace period of 30 days within which Buyer shall be allowed to make all payments due or to be become due thereunder.

"4. That all Bureau of Land Management permits involved in this transaction shall be held by and issued in Sellers' names throught [sic] the 1972 grazing season and so long thereafter as Buyer and Sellers may mutually agree, at which time Sellers shall agree to execute such necessary documents to effect a transfer thereof to Buyer.

"WITNESS our hands this 27th day of April, 1971.

/s/ H. R. Wagstaff

H. R. Wagstaff
/s/ Ross L. Reed

Ross L. Reed
/s/ Margaret D. Reed

Margaret D. Reed"

someone he knew to dig an extensive drainage ditch to carry away the water. Wagstaff replied that he was a construction contractor and could take care of it himself with little or no trouble. On another occasion, Reed told him the furnace smoked and showed him the black on the chimney. Wagstaff saw that the black was caused by freshly smeared tar. In May, 1971, Wagstaff met Reed at the ranch and Reed told him the Bureau of Land Management had been holding some hearings and there would probably be a reduction in grazing rights. At this time, he told Wagstaff he would let him out of the contract if he so desired. Wagstaff investigated and could find no one in BLM who knew of any hearings regarding any reduction of grazing rights.

Shortly thereafter, Reed told Wagstaff he had another purchaser for the property at a price $100,000.00 higher than Wagstaff's price and he would split that amount with Wagstaff if he would release Reed from the contract. Wagstaff rejected the proposal and replied that he was happy with the ranch. In early June, 1971, Reed, for no satisfactory reason, drained about half of the water out of the reservoir. By that time, the spring run-off for the year was over and this created a serious water deficiency causing great concern to the sharecropper on the property. While upset, Wagstaff kept his cool, refusing to be aggravated into cancellation of the contract.

On June 25, 1971, Reeds' lawyer sent Wagstaffs' lawyer a strong, demanding letter, advising that if the sale was not closed by July 7, 1971, the Reeds would declare a forfeiture and retain the $10,000.00 paid by Wagstaffs. Immediately, the Wagstaffs made arrangements for a closing in the office of Reeds' lawyer on July 2, 1971. A business emergency for Wagstaff arose, so Mrs. Wagstaff appeared with all money and executed papers necessary to complete a closing. This had been cleared by Wagstaff with Reed the night before and was satisfactory with Reed.

Other than a few minor changes, which the Reeds' attorney started to make, all documentation was in good shape. As they were about to be signed, Mrs. Wagstaff asked how soon they could get the keys. The Reeds wanted to stay four or five months; the Wagstaffs wanted to move in that summer. Because of these differences, Mrs. Wagstaff telephoned her husband, explained the situation and put Reed on the line. The Wagstaffs attempted to work out some reasonable arrangement but Reed became infuriated, stating, "I won't deal with you," and slammed down the 'phone. He announced to everyone in the office that the "deal is off" and told his attorney to make out a bill for his services. During his testimony, Mr. Reed also stated that on the occasion of his outburst, "I asked him [Wagstaff] how he would like to go to hell."

Shortly after the signing of the April 27, 1971 contract, Wagstaff entered the property and hired a contractor, under Wagstaff's supervision, to do earth work around the Reed Reservoir at a cost of $1,135.00. In addition, he obligated himself to Brinton, the resident sharecropper, for seed, phosphate, labor and equipment in the sum of $2,500.00 in connection with the current growing season, just starting. Reed was anxious that at the scheduled July 2, 1971 closing the Wagstaffs have checks to pay those items. The checks were brought and are in evidence.

On July 2, 1971, the date of the scheduled closing, Wadsworth, who had a grazing contract with the Reeds, delivered to Reed his promissory note for $9,000.00 to cover grazing fees which by the contract was to have been paid to the Wagstaffs. This was to be a credit on the $90,000.00 payable by the Wagstaffs at that time. The Wadsworths were present at the time set for closing.

On August 2, 1971, at Mr. Reed's instruction, the bank attempted to return the $10,000.00 deposit. Wagstaff refused it. On August 5, 1971, the check was returned to the bank together with a letter advising

that the Wagstaffs were ready, willing and able to perform as soon as a possession date could be worked out and that possession should be "within the reasonably near future." A response was requested but none was made.

On December 24, 1971, Wagstaffs' attorney wrote the Reeds advising that the Wagstaffs stood ready to perform and inquired whether it would be necessary to initiate legal action to enforce the agreement. Rather promptly, Reed wrote back as follows:

"Dec. 26–71
Yucca Valley, Calif.
"Mr. Hurd.

"Your letter of 24th Dec. 71. at hand. I called Mr. Wagstaff in regards our ranch deal. I will go along with same any time posible [sic] with Ron Wagstaff.

Obliged.
/s/ Ross L. Reed"

The telephone call from Reed to Wagstaff was, "Let's conclude the contract. We will use the contract that you presented on July 2; come down right after the first of the year." On the witness stand, when asked, Reed explained about the letter, "You'll have to talk to my hand; it's all hooked up with artheritis [sic] and sometimes it don't write what I want it to."

As a result of these events, the Wagstaffs flew to Yucca Valley with the contracts and money to close. The Reeds again refused to sign but wanted to renegotiate for $450,000.00 cash but the sale would include all hay and equipment. The Wagstaffs refused the proposition and, upon return home, mailed back to the Reeds for their signatures all the closing documents first tendered on July 2, 1971. Thereafter, Mrs. Reed telephoned the Wagstaffs and assured them they were coming back to Wyoming and would get together and finalize the contract. Other similar calls followed.

In February, 1972, at the instance of the Reeds, the Wadsworths traveled to Yucca Valley to negotiate a purchase of the ranch. They bargained back and forth and on February 7, 1972, signed a contract of sale for $400,000.00, including hay, farm equipment and other personal property. The Wagstaffs did not learn of this contract until Mrs. Wagstaff called Mrs. Reed to find out when they were coming back to Wyoming; Mrs. Reed advised they had sold the ranch to others but refused to tell her the buyers' names. The Wagstaffs found out and this lawsuit followed.

The patience of the Wagstaffs, against the scheming of the Reeds to induce a breach by the Wagstaffs, was prodigious. We cannot help but comment upon the arrogance and evasiveness of Mr. Reed in his performance as a witness and his denial of ever receiving any correspondence from the Wagstaffs, even in the face of overwhelming evidence to the contrary. Even in cold, written form, these conclusions are vivid; and to the trial judge, they must have been even more obvious. We can understand the trial court's findings in those elements having to do with evidence of facts relating to the matters of law arising from the documents themselves. These will, of course, be considered as this opinion moves along. The lengthy narrative just completed may form a landscape for the specifics with which we must deal and lends a greater understanding to our holdings. Other facts will be included as necessary to deal with the particular issues raised by the appellants. We are reserving a review of some of the facts, dealing with the specific performance segment of the case, until such time as we come to it.

The conclusions of law of the trial court are at this point footnoted.[2] They will be

2. Conclusions of Law:
"1. That the Contract of Sale of April 27, 1971 between WAGSTAFFS and REEDS is valid and enforceable as against the Defendants, REEDS.

"2. That subsequent to April 27, 1971, REEDS engaged in conduct that constituted part performance of the April 27, 1971 Contract, and by his [sic] actions in the latter part of December 1971, REEDS

referred to as required. Our outline of the factual background generally follows the written special findings of fact signed by the trial judge and found in the file.

The issues in connection with the claimed breach of contract raised by the parties are:

1. Was there a valid, enforceable contract?

2. Was the contract only an unenforceable agreement to make an agreement?

3. Was the April 27, 1971 agreement violative of the statute of frauds, § 16–1, W.S. 1957, C. 1965?

4. Was parol evidence admitted to vary the agreement of April 27, 1971?

5. Does failure to provide for a possession date render the contract invalid?

6. Was there partial performance?

7. Was there ratification?

8. Was there a breach of contract?

9. Should the following provision of the contract have been enforced:

"Upon acceptance of this offer, it is expressly understood and agreed that the earnest money shall be deposited with the First National Bank of Evanston, Wyoming, to be released to the seller upon approval of title and execution of the final contract of sale, and if for any reason the seller fails, refuses or neglects to have the abstracts of title continued or do any other things necessary or requisite for the preparation of the final contract of sale and other sales documents, upon demand the earnest money will be returned to the buyer."

10. Were damages properly computed, if there was a breach?

11. Appellees-Wagstaffs and appellants-Reeds contend that if there is a contract, specific performance should have been granted rather than damages.

As indicated, many issues have been presented but probably the most pressing, basic one is whether or not the April 27, 1971 document is a valid, enforceable agreement. To resolve that are tributary issues which flow into the ultimate resolution of that major problem.

Reeds' contention that the agreement is no more than an agreement to make an agreement, violative of the statute of frauds, is without merit under the circumstances of this case. As said in 8A Thompson on Real Property, 1963 Replacement, § 4462, p. 355:

"* * * The modern authorities indicate that the memorandum is sufficient if it contains all the necessary elements even though it contemplates the subsequent execution of a more comprehensive agreement. There is a contract for the sale of land where the writing definitely and particularly describes the land, acknowledges receipt of payment, and provides for a deed on further payment. The contract must recite the name of the grantee or point out a method by which he may be ascertained with certainty. The contract is not invalidated by the failure to specify the rate of interest and date of possession or the time for payment. * * *"

The contract here contained all those essential elements. The very language of the applicable portion of the Wyoming statute of frauds contemplates only "some note or memorandum" and not a formal

---

expressly ratified and affirmed said Contract of April 27, 1971.

"3. That the REEDS materially breached said Contract by failing to perform its provisions and by entering into a second sale of the subject real property to a third party on February 7, 1972.

"4. That the April 27, 1971 Contract between the WAGSTAFFS and REEDS is not lacking under the Statute of Frauds of this State, nor is said Contract of Sale vague, uncertain, or unenforceable for failure to specify possession date, mutuality of obligation, acceptance of title, or by reaon of latches [sic] or estoppel.

"5. That Plaintiffs, WAGSTAFF [sic], are entitled to compensatory damages against REEDS for said breach of Contract.

"6. That compensatory damages are measured in this Case by the loss of the benefit of Plaintiffs' bargain and by a loss of the Plaintiffs' use of the property."

document.[3] The vendor cannot willfully and unilaterally refuse to enter into a more formal instrument and then hide behind the statute of frauds because it was not done, even though the memorandum is adequate in its terms.

The Reeds cite *Bentzen v. H. N. Ranch, Inc.*, 1958, 78 Wyo. 158, 320 P.2d 440, as authority for their position. The *Bentzen* contract contained no provision for payment of the balance of the purchase price which, by an ambiguous provision in other respects, was to be agreed upon in the future. In that particular, the law is definite and settled that leaving open the terms of payment for future negotiation is a fatal incompleteness. We have no argument with that case or its rule. That case must be confined to its facts. In the case before us, the terms of payment are implicit and not open for negotiation at a future time. That the matters claimed as indefinite do not invalidate the memorandum as an enforceable contract will follow.

▮ A contract of sale should, if possible, be rendered operative in that the parties are supposed to have intended something by their agreement. *Kelley v. Ellis,* 1956, 272 Wis. 333, 75 N.W.2d 569, reh. den. 76 N.W.2d 540. Where, as here, the parties reduce their understanding to writing and it may in some respects appear to be indefinite, the resulting contract does not necessarily fail.

▮ The Reeds take the position that the contract lacked an essential element, namely, it was silent as to the time of possession. The law is well settled that in the absence of a provision as to the time of performance, a reasonable time is implied. Annotation, 56 A.L.R.2d 1272, 1280, "Effect of failure of contract for sale or exchange of real estate to specify time for giving of possession." The number of cases supporting that proposition is impressive.[4]

It must be understood that when a contract of purchase and sale is first entered into, there are preliminary preparations necessary to prepare for a closing, such as examination of title. It is not always practicable to specify a particular date of possession. Possession is an incident of the contract and contemplated by the parties. A reasonable time would soon follow closing and was so considered by the parties.

There is in the contract some indication of the time for possession. The April, 1971 agreement sets out that interest of 6% on the unpaid balance of the purchase price is "to run from the date of possession." The same agreement sets forth that the Reeds are entitled to interest on the contract from July 1, 1971, thus pointing to the time of possession as being the latter date. By the Reeds' testimony, they expected interest at 6% per annum to run from July 1, 1971. The trial court could have found that under those circumstances the intended possession was to be simultaneous with the running of interest and that

---

3. § 16–1, W.S.1957, C.1965: "In the following cases every agreement shall be void unless such agreement, or some note or memorandum thereof be in writing, and subscribed by the party to be charged therewith:

    \*    \*    \*    \*    \*

    "Fifth—Every agreement or contract for the sale of real estate, or the lease thereof, for more than one year;

    \*    \*    \*    \*    \* "

4. See those cited in 56 A.L.R.2d 1272, 1280, and as a further sampling, *Shull v. Sexton,* 1964, 154 Colo. 311, 390 P.2d 313; *Wetherbee v. Gary,* 1963, 62 Wash.2d 123, 381 P. 2d 237, 240; *Kelley v. Ellis,* supra; *Silverman v. Alpart,* 1953, 282 App.Div. 631, 125 N.Y.S.2d 602; *Janiszewski v. Shank,* 1925, 230 Mich. 189, 202 N.W. 949, 950. Implicit in an agreement to convey real estate is the doctrine that performance, unless otherwise specified, must be accomplished within a reasonable time. *Schneider v. Warner,* 1975, 69 Wis.2d 194, 230 N.W.2d 728; *Bumann v. Maurer,* N.D.1972, 203 N.W.2d 434; *Phillips v. Campbell,* Tex.Civ.App.1972, 480 S.W.2d 250; *A. B. C. Auto Parts, Inc. v. Moran,* 1971, 359 Mass. 327, 268 N.E.2d 844. Failure to specify time of payment is not such an uncertainty as to make specific performance inappropriate but it must be reasonable within a reasonable time. *Pegg. v. Olson,* 1924, 31 Wyo. 96, 106, 223 P. 223, 226.

July 1, 1971, was acceptable. It might also be inferred that since taxes were to be prorated as of the date of possession, the Wagstaffs were to pay for the last half of 1971. It is of further significance that the Wagstaffs were to receive the 1971 crops grown on the premises. We need not fix a time of possession and only point to these facts to show that possession by the sellers was anticipated at some reasonable time after closing if not on the date of closing. It was because of the unreasonable conduct of Mr. Reed in calling off the deal and refusing to discuss any time of possession, other than his own idea, that the sale was not closed on July 1, 1971. There is no indication that the Wagstaffs were unwilling to arrive at some mutually acceptable date. Where no time of performance is specified, the law implies performance within a reasonable time and a reasonable time depends upon the circumstances of each case. *Black & Yates v. Negros-Philippine Lumber Company,* 1924, 32 Wyo. 248, 231 P. 398, 37 A.L.R. 1487.

■■ The Reeds claim that a fatal uncertainty exists because there was no agreement by Wagstaffs that they would assume and pay the existing mortgage— merely a statement that the title "was subject to a mortgage." There was at the trial level no dispute as to that provision. Reeds readily agreed that it was their obligation. In the absence of any agreement by the Wagstaffs to assume the mortgage, it was no more than an encumbrance upon clear title which was the obligation of the sellers to discharge. As we view the provision, it was only to alert the buyers that when they examined title, they would find a mortgage and should not be surprised. The Reeds cite us to no authority that such a statement invalidates a contract. Where an appellant makes only a perfunctory argument in support of a contention, the court need not consider it. *Pure Gas & Chemical Company v. Cook,* Wyo.1974, 526 P.2d 986. In such situation, in which no cogent argument is made, no consideration is merited. *Joly v. Safeway Stores, Inc.,* Wyo.1972, 502 P.2d 362.

Nothing of any real substance was lacking in the compact. We hold that there was a valid, enforceable contract for the sale of the Reed ranch.

■ We fail to find, as contended by the Reeds, that the contract terms have in any way been varied, altered or added to by any parol evidence. While there was extensive testimony and documentary evidence, its thrust was mainly to establish the breach of contract by the Reeds and directed to the claim of Wagstaffs that they were entitled to specific performance as against the Wadsworths. We hold that the written contract of the parties in this case is entirely within its four corners and that it is valid and enforceable, as written.

We need not reach points made by the Wagstaffs that they partially performed, as found by the trial court, and that the Reeds ratified the agreement in writing. Holding as we do that there was a valid and enforceable contract entered into between the Wagstaffs and the Reeds and in compliance with the statute of frauds, part performance is immaterial as is any subsequent ratification. Part performance only becomes a significant issue when a contract fails to satisfy the statute of frauds. *Butler v. McGee,* Wyo.1962, 373 P.2d 595; *Gaido v. Tysdal,* 1951, 68 Wyo. 490, 235 P.2d 741. There was no need to ratify a valid contract.

■ If the contract is valid and enforceable and repudiation by the Reeds was unauthorized by the terms of the agreement, then we hardly need examine any technical aspects of breach of contract. The Reeds played along with and lulled the Wagstaffs into anticipation of performance most any moment, then sold the property to others. A breach of contract is the failure, without legal excuse, to perform any promise which forms the whole or part of the contract and may be inferred from the refusal of a party to recognize the existence of a contract or the doing of something inconsistent with its existence. 8A Thompson on Real Property, 1963 Replacement, § 4475, pp. 429–430. We hold that the Reeds committed a breach of contract

and rendered themselves liable for damages by repeated and extended refusal to perform, culminated by sale of the property to the Wadsworths.

■ The Reeds next assert that even if there was a valid contract, they had a right to terminate it under the terms of the agreement itself providing that:

"Upon acceptance of this offer, it is expressly understood and agreed that the earnest money shall be deposited with the First National Bank of Evanston, Wyoming, to be released to the seller upon approval of title and execution of the final contract of sale, and if for any reason the seller fails, refuses or neglects to have the abstracts of title contined or do any other things necessary or requisite for the preparation of the final contract of sale and other sales documents, upon demand the earnest money will be returned to the buyer."

Their position is that they had a right to renig by refusal to perform and all Wagstaffs could do about it was get back their earnest money, without penalty to the Reeds. What a strange concept! Putting the shoe on the other foot, if the Wagstaffs refused to perform, it would cost them a $10,000.00 forfeiture. That paragraph was for the benefit of the buyers. It would stretch our credulity and cause us to doubt the sanctity of contract if it was as contended by the Reeds. The Reeds cite no authority for such a version of the provision.

A fundamental canon of construction, in determining the meaning of contract provisions, is to ascertain the intent of the parties. *Shellhart v. Axford,* Wyo.1971, 485 P.2d 1031, 1034. Where the terms of the contract are plain and unambiguous, the meaning is deduced from the language alone. *Craig v. Gudim,* Wyo.1971, 488 P.2d 316, 319. The plain language above says, in essence, that if the sellers breach by failing to prepare the final papers for the sale, the buyers can demand the return of their deposit. The contract is not automatically terminated upon the sellers' procrastination. The provision in question merely expresses the general law which allows the buyer, not himself in default, to at his option recover the money he has paid when the seller refuses to perform. 8A Thompson on Real Property, 1963 Replacement, § 4477, pp. 439–440.

■ It is true, as contended by the Reeds, that any doubt about the meaning will be resolved against the writer of the contract (here, Wagstaffs, the buyers). *Goodman v. Kelly,* Wyo.1964, 390 P.2d 244, 248. However, a party will not be permitted to strain construction of the instrument to establish an ambiguity so that this rule can be invoked. *Central Casualty Company v. Newman Transit Co.,* D.C. Wyo.1962, 203 F.Supp. 413, 414, appeal dismissed 10 Cir. 1962, 311 F.2d 226.

■ It appears that Reeds are attempting to make a strained construction and milk out a meaning which is not in the plain words of the contract. The contract does not allow the sellers to escape from their obligation at will. It is a universal rule that a party to a contract cannot take advantage of his own act or omission to escape liability thereon. *Dallas Dome Wyoming Oil Fields Co. v. Brooder,* 1939, 55 Wyo. 109, 97 P.2d 311.

For breach of the land sales contract by sellers Reed, the trial court found and awarded damages to the contract purchasers Wagstaff in the amount of $213,350.00. This amount is the difference between the fair market value of the land on February 7, 1972, the date of the sale of the land to the subsequent purchasers Wadsworth, and the price set in the Reed-Wagstaff contract of April 27, 1971.

The appellants-Reed do not argue with that measure of damages applied by the trial court as far as time span is concerned, so we need not question it as an issue in that sense on appeal. We therefore make no holding in that regard. They, however, argue that the damages awarded by the trial court are unsupported by the evidence in the sense that the trial court should have accepted the sale price to the

Wadsworths as the measure, rather than the testimony of Palmer, an expert appraiser, whose qualifications they admit. The Reeds point out that the property sold to the Wadsworths for $400,000.00, and included the hay, machinery and equipment. The sales price to the Wagstaffs was $350,000.00 without those items, with the result that the selling price to the Wadsworths and the contract price to the Wagstaffs were reasonably together in amount. We gather from that position that the Reeds are asserting that the true measure is the difference between the selling price to the subsequent purchasers and the contract price fixed by the contract breached by the sellers.

The position of the Reeds, as we understand it, embraces a concept that a particular parcel or combination of parcels are the only piece or pieces of land like them in the whole world and the value is established by what that parcel or parcels sell for if reasonably close in time to the event to which it is to be associated, which here would be the date the contract was entered into with the Wagstaffs.

The Reeds correctly point out that *Hickey v. United States,* 3 Cir. 1953, 208 F.2d 269, cert. den. 347 U.S. 919, 74 S.Ct. 519, 98 L.Ed. 1074, and other cases cited by Wagstaffs, deal with the valuation of real property in condemnation cases and not breach of contract cases. The rule in the condemnation cases is that the weight to be given evidence of the price for which sold in a prior sale of the same property is left to the sound discretion of the trial court. It makes no difference that those cases were condemnation cases. The method of arriving at the market value is the same.

Market value is determined in the same fashion regardless of in what sort of case it might arise as a question.

None of the parties have squarely argued the real measure of damages in a breach of contract case under the circumstances of the case before us.

■ The measure of damages applied by the trial court was proper. The measure of damages for breach of a contract of sale is the difference between the contract price and the value of the property at the time of the breach of contract. *Francis v. Brown,* 1915, 22 Wyo. 528, 145 P. 750; *Johnson v. McMullin,* 1889, 3 Wyo. 237, 21 P. 701, 4 L.R.A. 670. Such damages represent the loss of the bargain. 8A Thompson on Real Property, 1963 Replacement, § 4478, p. 449. See also Annotation, "Vendor and Purchaser: Recovery for Loss of Profits from Contemplated Sale or Use of Land, Where Vendor Fails or Refuses to Convey," 11 A.L.R.2d 719, 721, where it was observed that general damages for a vendor's failure or refusal to convey land are usually based on the difference between the contract price and the market value of the land at the time of the breach and this is to compensate for what is referred to as "loss of the bargain." The cases establishing this rule are voluminous.[5]

In *Bunnell v. Bills,* supra, note 5, it was recognized that although a subsequent sale of the same property may be evidence of market value, it is not conclusive. In *Shirley v. Merritt,* 1961, 147 Colo. 301, 364 P.2d 192, it is pointed up that a price received is only evidence of value and not the measure of damage. In *Sorenson v. Connelly,* supra, note 5, it was stated that

5. *Sorenson v. Connelly,* Colo.App.1975, 536 P.2d 328; *Montgomery v. Cook,* 1966, 76 N.M. 199, 413 P.2d 477; *Lane v. Coe,* 1964, 262 N.C. 8, 136 S.E.2d 269; *Freedman v. Cholick,* 1963, 233 Or. 569, 379 P.2d 575; *Bunnell v. Bills,* 1962, 13 Utah 2d 83, 368 P.2d 597; *State ex rel. Robins v. Clinger,* 1951, 72 Idaho 222, 238 P.2d 1145; *Adams v. Cox,* 1950, 54 N.M. 256, 221 P.2d 555; *Quick v. Pointer,* 1950, 88 U.S.App.D.C. 47, 186 F.2d 355. See also 5 Corbin on Contracts, § 1098, beginning at page 525, for the same rule stated in the following language:
"* * * [I]f the seller fails to convey the title that he contracted to convey, the buyer has a right to damages measured by the value of the land at the time it should have been conveyed, less the contract price as yet unpaid. * * *"
To the same effect is 11 Williston on Contracts, 3d Ed., Jaeger, § 1399, p. 527.

while resale of the property following breach was evidence of the market value at the time of the breach, it was not conclusive thereon. In *Aboud v. Adams,* 1973, 84 N.M. 683, 507 P.2d 430, the court, in an action by a vendor against the vendee for damages for breach of contract, reversed an award of damages on the basis of difference between agreed price and price obtained by vendor after breach as improper in that there was no finding as to market value at time of breach on the ground that the amount received on resale is only one factor and not conclusive in determining market value. The New Mexico court pointed out that it was using the same rule applicable to a breach by the vendor, the so-called "loss of bargain" rule. See also *Gillingham v. Stadler,* 1970, 93 Idaho 874, 477 P.2d 497, and *Andreasen v. Hansen,* 1959, 8 Utah 2d 370, 335 P.2d 404.

■ The loss of bargain rule conceives that the defaulting vendor must make good whatever the vendee may have lost by reason of the breach. So far as money can do it, the vendee must be placed in the same situation as if the contract had been performed. Since the subject land is no longer available, the market sale of a comparable ranch would be the equivalent to the one he has lost. Having lost the subject ranch, the Wagstaffs should be placed in a position to buy one like it.

■ In a case involving Wyoming law, it was said that the trial court should consider all relevant evidence of market value, including other sales of the same or similar property, which were transacted reasonably close in time and distance and under comparable market conditions. *Tenneco Oil Company v. Gaffney,* 10 Cir. 1966, 369 F. 2d 306. Thus, in Wyoming, market value is not necessarily equal to the resale price of the same land.

■ The Wyoming law on determination of real estate value has been developed principally in condemnation actions. The general principles are applicable here. Sales of similar property in the vicinity are evidence of market value. *Morrison v. Cottonwood Development Co.,* 1928, 38 Wyo. 190, 202, 209, 266 P. 117, 120, 123–124. To use evidence of comparable sales, a foundation must be laid as to the similarity of properties, but there is no general rule as to the degree of similarity and the propriety of receiving such evidence must be determined by the trial judge in his discretion. *State Highway Commission of Wyoming v. Joe Miller Land Company,* 1970, 467 P.2d 450, 454, and *State Highway Commission v. McNiff,* 1964, 395 P.2d 29, 31.

■ In this case, the trial court admitted and accepted the estimate of land value given by an expert appraiser. The appraisal was based mainly upon sales of comparable land, the appraiser having considered the resale price but having found it unrepresentative of the true land value. The trial judge did not abuse his discretion in admitting and accepting this evidence of value and the measure of damages, based on the difference between the appraised value at the time of resale and the contract price, was proper.

■ The Wagstaffs in their cross-appeal and the Reeds in their appeal urge the court to grant specific performance as against the Wadsworths, rather than award damages against the Reeds for breach of contract. For breach of a contract for the sale of real estate, specific performance is available even though the land has been conveyed to a third party who was on notice of the contract; but the remedy will not be used when the land has been conveyed to a bona fide purchaser for value or where other controlling equities intervene. 81 C.J.S. (Specific Performance) § 26c, p. 468. A purchaser of land, not a bona fide purchaser, takes subject to a prior contract for sale and the purchaser under the contract may have specific performance of that contract against a subsequent purchaser who had notice of the contract. *Frank v. Stratford-Handcock,* 1904, 13 Wyo. 37, 52, 77 P. 134, 136, 67 L.R.A. 571, 575, 110 Am.St.Rep. 963, 968.

The factual situation in this case is a close one. Were we the fact finder in this case, we could well have found that the

Wadsworths were not bona fide purchasers. They were present on July 2, 1971, when the Reeds aborted the closing; they were renters of pasture on the subject ranch; they had been contacted by Mr. Wagstaff late in 1971 by an offer to sell him hay on the ranch; the contract form by which the Wadsworths purchased the ranch was an adaptation of the one presented by the Wagstaffs to the Reeds. They could well have been aware that they were buying a lawsuit.

On the other hand, the Wadsworths had been assured by the Reeds that all negotiations with the Wagstaffs had been broken off; the Wagstaffs had never served any specific notice on the Wadsworths that they considered the contract of sale still in effect; the contract between the Wagstaffs and the Reeds had never been recorded nor had the Wagstaffs ever taken any possession of the ranch; over six months had expired after the aborted closing before court action was initiated and it was not until late 1974 that the case was finally tried. It was early 1975 before a motion for new trial was finally overruled. After the Wadsworths purchased the ranch from the Reeds and before any court action was filed, they made extensive improvements and invested in additional cattle.

The trial court made no special findings of fact on the claim of the Wagstaffs, against the Wadsworths for specific performance, and found only generally in favor of the Wadsworths in denying specific performance. Where facts are established by a general finding of the court, it is presumed that disputed facts are in favor of the party for whom the trial court found. *Oedekoven v. Oedekoven,* Wyo. 1975, 538 P.2d 1292. We can infer that the trial court found on the conflict that the Wadsworths were bona fide purchasers.

Specific performance is not granted as a matter of absolute right even though there is a valid contract. The remedy will be utilized only in the discretion of the court, depending on the facts of the case and the special equities of the situation. *Otis Oil & Gas Corporation v. Maier,* 1955, 74 Wyo. 137, 146–147, 284 P. 2d 653, 656; *Merrill v. Rocky Mountain Cattle Co.,* 1918, 26 Wyo. 219, 181 P. 964; *Keller v. California Liquid Gas Corporation,* D.C.Wyo.1973, 363 F.Supp. 123, 128.

Section 367, Restatement of the Law of Contracts, p. 665, declares that specific enforcement of a contract may be refused if its enforcement would cause unreasonable or disproportionate hardship to third persons. It would be difficult for us to disagree with the trial judge that specific performance would work an unnecessary hardship on the Wadsworths.

There is no clear showing that the trial court abused its discretion in denying specific performance. *H K D Homesite Company v. Board of County Commissioners of Laramie County, Wyoming,* 1952, 69 Wyo. 236, 240 P.2d 885. We hold that there was no error in the denial of specific performance.

After every careful consideration, we affirm the trial court in every respect.