# IN THE SUPREME COURT, STATE OF WYOMING

## 2013 WY 34

### OCTOBER TERM, A.D. 2012

### March 19, 2013

BARLOW RANCH, LIMITED
PARTNERSHIP,

Appellant,
(Defendant),

v.                                                    S-12-0038

GREENCORE PIPELINE COMPANY
LLC,

Appellee
(Plaintiff).


GREENCORE PIPELINE COMPANY,
LLC,

Appellant
(Plaintiff),

v.                                                    S-12-0039

BARLOW RANCH, LIMITED
PARTNERSHIP,

Appellee
(Defendant).

*Appeal from the District Court of Campbell County*
The Honorable Keith G. Kautz, Judge

*Representing Barlow Ranch, Limited Partnership:*
Dan B. Riggs, Mistee L. Elliott and Amanda K. Roberts of Lonabaugh and Riggs, LLP, Sheridan, Wyoming. Argument by Mr. Riggs and Ms. Elliott.

*Representing Greencore Pipeline Company, LLC:*

Jon T. Dyre of Crowley Fleck, PLLP, Billings, Montana; Timothy M. Stubson of Crowley Fleck, PLLP, Casper, Wyoming. Argument by Messrs. Dyre and Stubson.

*Before KITE, C.J., and GOLDEN\*, HILL, VOIGT, and BURKE, JJ.*

*\*Justice Golden retired effective September 30, 2012.*

**NOTICE: This opinion is subject to formal revision before publication in Pacific Reporter Third. Readers are requested to notify the Clerk of the Supreme Court, Supreme Court Building, Cheyenne, Wyoming 82002, of typographical or other formal errors so correction may be made before final publication in the permanent volume.**

**KITE, Chief Justice.**

[¶1] Greencore Pipeline Company, LLC (Greencore) filed an action seeking to condemn easements across property owned by Barlow Ranch, Limited Partnership (Barlow) for a pipeline to transport carbon dioxide ($CO_2$). The parties reached an agreement on the terms of possession and scope of the easements but asked the district court to determine the amount that would justly compensate Barlow for the partial taking of its property.

[¶2] During a two day bench trial, Barlow presented evidence of prices paid for other comparable pipeline easements to show the fair market value of Greencore's easement and the compensation due for the partial taking. Greencore argued that Barlow was only entitled to a percentage of fee value and comparable easement sales should not be considered in determining the appropriate amount of compensation for the condemned easement. The district court concluded Wyoming statutes allowed consideration of comparable sales in determining just compensation, but the easements Barlow presented were not sufficiently comparable to be reliable evidence of the fair market value of Greencore's easement. Instead, it awarded compensation based upon the average of the amounts Greencore had paid other landowners for easements for its $CO_2$ pipeline. Barlow appealed the district court's order and Greencore cross appealed.

[¶3] In its appeal, Barlow claims the district court erred in concluding the easements it relied upon were not valid comparables. Barlow also asserts the district court erred in concluding annual payments for a condemned easement are not permissible under Wyoming law. In its cross appeal, Greencore asserts the district court erred in considering evidence of comparable easements in arriving at a damages award far in excess of the fair market value of the land on which the easement is located. Greencore further asserts the district court erred in not granting it the right to abandon the pipeline in place.

[¶4] Addressing the issues in a different order than the parties present them, we conclude the district court properly ruled that it could consider evidence of comparable easements in determining just compensation. The court, however, erred in concluding Barlow's proffered easements were not the result of arms' length transactions or sufficiently comparable, while the other Greencore easements were. The district court also erred by concluding annual payments are not allowed under Wyoming law, but correctly ruled that the issue of whether Greencore may abandon the pipeline in place is not properly before the court at this time. Affirmed in part and reversed and remanded in part.

**ISSUES**

[¶5] The issues presented in these consolidated cases are:

1

A. Did the district court err by concluding comparable easements were proper evidence to establish the value of a partial taking of real property for a pipeline easement?

B. Did the district court err when it ruled the easements offered by Barlow as comparables were not the result of arms' length transactions?

C. Did the district court err in concluding the pipeline easements offered by Barlow were not comparable to the Greencore easement pursuant to Wyo. Stat. § 1-26-704(a)(iii)(B) and (C) (LexisNexis 2011)?

D. Did the district court err in concluding annual payments for a condemned easement are not permissible under Wyoming law?

E. Did the district court err when it refused to rule that Greencore was entitled to abandon its pipeline in place when its need for it terminates?

## FACTS

[¶6] Greencore is a Delaware limited liability company with its principal place of business in Texas. It planned to build a twenty inch pipeline to transport $CO_2$ from the Lost Cabin Gas Plant in Fremont County, Wyoming to the Bell Creek Oil Field in southeastern Montana. To construct and maintain the pipeline, Greencore needed a 100 foot construction and fifty foot permanent easement across property located in Campbell County belonging to Barlow and others.

[¶7] Greencore was able to reach agreements with sixty-three other landowners to purchase easements on their property, but could not agree with Barlow, Mitchel M. Maycock and Dixie Lea Maycock, Trustees of the Mitchel M. Maycock Revocable Trust, Mitchel M. Maycock and Dixie Lea Maycock, Trustees of the Dixie Lea Maycock Revocable Trust, Joseph C. Maycock (collectively "Maycocks") or Brown-Kennedy Ranch Co. (B-K). Therefore, Greencore filed a complaint against those parties seeking to have the portion of their properties across which the pipeline would run condemned pursuant to Wyo. Stat. Ann. § 1-26-814 (LexisNexis 2011).[1]

---

[1] Section 1-26-814 states:

**Right of eminent domain granted; petroleum or other pipeline companies; purposes.**

Whenever any utility or any petroleum or other pipeline company, authorized to do business in this state, has not acquired by gift or purchase any land, real estate or claim required for the construction, maintenance and operation of their facilities and appurtenances or which may be affected by any operation connected with the

[¶8] In its complaint, Greencore asked the district court to set a hearing to determine its right to condemn the easements, enter an order permitting it to have possession and use of the property during the condemnation proceedings and determine an amount to be paid to Barlow, Maycocks and B-K for the condemned property. In accordance with Wyo. Stat. Ann. § 1-26-513(a) (LexisNexis 2011),[2] Greencore also deposited with the district court $136,323.83, which amount reflected the combined total of its final purchase offers to Barlow, Maycocks and B-K.

[¶9] After Greencore filed its complaint, the parties entered into stipulations agreeing that Greencore could properly obtain the easements by condemnation and granting easements for the construction, operation and maintenance of the pipeline. The district court entered orders pursuant to the parties' stipulations. The parties' agreements left unresolved two issues: 1) the amount of compensation due the landowners for the taking, and 2) whether Greencore was required to remove the pipeline or could abandon it in place when it was no longer in use. The district court set those matters for trial. Prior to trial, Greencore and B-K entered into a settlement agreement and the district court dismissed B-K with prejudice pursuant to a stipulated motion.

[¶10] Also prior to trial, Barlow and Maycocks filed a designation of expert witnesses in which they identified Robert Zabel, a certified general real estate appraiser, as one of their expert witnesses. They attached to the designation a summary appraisal report Mr. Zabel prepared in which he calculated a fair market value for the easement. The report indicates Mr. Zabel relied in part on contracts Barlow and Maycocks negotiated for other easements of comparable type, size and location on the same or similar property. He stated that the use of comparable sales was a generally accepted appraisal technique. Mr. Zabel concluded the fair market value of the Greencore easement was an initial payment

---

construction or maintenance of the same, the utility or company has the right of eminent domain and may condemn the easement required by the utility or company.

[2] Section 1-26-513(a) provides:

(a) At the time of commencing an eminent domain proceeding the condemnor shall deposit in court an amount equal to the condemnor's last offer of settlement prior to the action. Upon motion of the condemnee and following a hearing if the amount originally deposited is clearly inadequate, the court shall order the condemnor to make an additional deposit. The clerk of court shall invest the deposit in any legal interest bearing investment and interest earnings shall accrue to the account of the condemnor.

Greencore offered Barlow $42,603.66, Maycocks $23,702.09 and B-K $70,018.08.

of $25.00 per rod[3] and an annual payment of $3.00 per rod with an annual consumer price index (CPI) adjustment.[4]

[¶11] Greencore subsequently filed a motion for partial summary judgment asking the district court to rule as a matter of law that the only measure of damages in a condemnation action for the partial taking of property is the difference between the value of the property before and after the taking and that evidence of prices paid for comparable easements was not admissible to show fair market value in the context of partial takings. Alternatively, Greencore asked for a ruling that Barlow and Maycocks were entitled only to a lump sum payment, not annual payments, and the lump sum payment for an easement could not exceed the fair market value of a fee simple interest in the property covered by the easement. Greencore attached to its summary judgment memorandum the affidavit of Neal Hilston, a certified general real estate appraiser, in which he opined that the fair market value for a fee simple interest in the property being acquired for Greencore's pipeline easement was $325 per acre.

[¶12] On the first day of trial, the district court denied Greencore's summary judgment motion, concluding that evidence of comparable sales was admissible but finding that issues of material fact existed as to whether the other transactions were arms' length and/or comparable to the Greencore easement. The trial proceeded, and the district court found the evidence Barlow and Maycock presented concerning other easements did not establish that they were truly arms' length or comparable to the Greencore easement. The district court concluded the evidence Greencore presented showing that it paid an average of $50 per rod to other landowners for its CO2 pipeline easement, including a similarly situated landowner west of the Barlow and Maycock properties, established the value of Greencore's interest. The district court found the difference in value of the Barlow property before and after the taking to be $9,189.00 and concluded the value of the interest Greencore obtained from Barlow computed at $50 per rod was $43,034.00.

[¶13] The district court also held that an annual payment could not form part of the just compensation in a condemnation action because "Wyoming law anticipates a valuation at a specific date, not an unknown valuation dependent on the life of a gas field or pipeline." The court further concluded there was no evidence showing adverse impact from abandonment of the pipeline in place but that removal would result in additional surface disturbance. The court stated no evidence was presented to address the reasonableness of

---

[3] A rod is 16.5 linear feet.

[4] The Bureau of Labor Statistic defines CPI as "a measure of the average change over time in the prices paid by urban consumers for a market basket of consumer goods and services." http://www.bls.gov/cpi/cpifaq.htm#Question_1. Some of the easement agreements tied the annual adjustment to the percentage of increase or decrease in the average weekly earnings of Crude Petroleum and Gas Production Workers between the last calendar year and the previous calendar year.

removing the pipeline once it is abandoned and it was unable to rule on that issue until the pipeline is abandoned. The district court entered judgment consistent with its findings and conclusions and ordered Greencore to pay Barlow $43,034.00. Barlow appealed and Greencore cross appealed.

## STANDARD OF REVIEW

[¶14] The district court conducted a bench trial in this case.

> Following a bench trial, this Court reviews a district court's findings and conclusions using a clearly erroneous standard for the factual findings and a *de novo* standard for the conclusions of law. *Piroschak v. Whelan,* 2005 WY 26, ¶ 7, 106 P.3d 887, 890 (Wyo.2005)[.]
>
> > The factual findings of a judge are not entitled to the limited review afforded a jury verdict. While the findings are presumptively correct, the appellate court may examine all of the properly admissible evidence in the record. Due regard is given to the opportunity of the trial judge to assess the credibility of the witnesses, and our review does not entail re-weighing disputed evidence. Findings of fact will not be set aside unless they are clearly erroneous. A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.
>
> *Piroschak,* ¶ 7, 106 P.3d at 890. Findings may not be set aside because we would have reached a different result. *Harber v. Jensen,* 2004 WY 104, ¶ 7, 97 P.3d 57, 60 (Wyo.2004). Further,
>
> > we assume that the evidence of the prevailing party below is true and give that party every reasonable inference that can fairly and reasonably be drawn from it. We do not substitute ourselves for the trial court as a finder of facts; instead, we defer to those findings unless they are unsupported by the record or erroneous as a matter of law.
>
> *Id.* (quotation marks omitted) (some citations omitted).

*Pennant Serv. Co. v. True Oil Co., LLC,* 2011 WY 40, ¶ 7,
249 P.3d 698, 702–03 (Wyo.2011).

*BJ Hough, LLC v. City of Cheyenne,* 2012 WY 140, ¶ 8, 287 P.3d 761, 764-65 (Wyo. 2012) (some citations omitted). Statutory interpretation presents a question of law which we review *de novo. Sinclair v. City of Gillette*, 2012 WY 19, ¶ 8, 270 P.3d 644, 646 (Wyo. 2012). An incorrect application of law can lead to errors in findings of ultimate fact. *See, e.g., Brown v. Arp and Hammond Hardware Corp.,* 2006 WY 107, ¶ 40, 141 P.3d 673, 685-86 (Wyo. 2006); *Jackson Hole Mountain Resort Corp. v. Alpenhof Lodge Assocs.,* 2005 WY 46, ¶ 17, 109 P.3d 555, 561 (Wyo. 2005).

## DISCUSSION

### 1. *Admissibility of Evidence of Comparable Easement Transactions*

[¶15]  We start with Greencore's primary issue—whether, as a matter of law, evidence of the prices paid for comparable easements is properly considered in determining the value of a condemned pipeline easement.  A ruling by this Court that evidence of comparable easements is not admissible to establish the fair market value in partial takings cases would also resolve completely Barlow's issue with regard to the comparability of the easements.

[¶16]  Eminent domain proceedings are authorized by constitutional and statutory provisions and governed procedurally by W.R.C.P. 71.1.  The taking of private property for public or private use without due or just compensation is constitutionally prohibited. Wyo. Const. art. 1, §§ 32-33; U.S. Const. amend. V.  The focus of the present case is on how to properly determine due or just compensation.

[¶17]  The applicable portions of the Eminent Domain Act state:

> **§ 1-26-701. Compensation standards.**
>    (a) An owner of property or an interest in property taken by eminent domain is entitled to compensation determined under the standards prescribed by W.S. 1-26-701 through 1-26-713.
>    (b) Unless otherwise provided by law, the right to compensation accrues upon the date of possession by the condemnor.
>    (c) Except as specifically provided by W.S. 1-26-701 through 1-26-713, compensation, damages, or other relief to which a person is otherwise entitled under this act or other law are not affected, but duplication of payment is not permitted.

6

**§ 1-26-702. Compensation for taking.**
  (a) Except as provided in subsection (b) of this section, the measure of compensation for a taking of property is its fair market value determined under W.S. 1-26-704 as of the date of valuation.
  (b) If there is a partial taking of property, the measure of compensation is the greater of the value of the property rights taken or the amount by which the fair market value of the entire property immediately before the taking exceeds the fair market value of the remainder immediately after the taking.

. . . .

**§ 1-26-704. Fair market value defined.**
  (a) Except as provided in subsection (b) of this section:
          (i) The fair market value of property for which there is a relevant market is the price which would be agreed to by an informed seller who is willing but not obligated to sell, and an informed buyer who is willing but not obligated to buy;
          (ii) The fair market value of property for which there is no relevant market is its value as determined by any method of valuation that is just and equitable;
          (iii) The determination of fair market value shall use generally accepted appraisal techniques and may include:
                  (A) The value determined by appraisal of the property performed by a certified appraiser;
                  (B) The price paid for other comparable easements or leases of comparable type, size and location on the same or similar property;
                  (C) Values paid for transactions of comparable type, size and location by other companies in arms length transactions for comparable transactions on the same or similar property.[5]

[¶18]  In determining whether it is proper to consider evidence of comparable easement sales in ascertaining fair market value of a condemned easement under the above provisions, we apply our usual rules of statutory interpretation.

> [Our] paramount consideration is to determine the legislature's intent, which must be ascertained initially and

---

[5] Subsection (a)(iii) was added by legislative amendment in 2007.

primarily from the words used in the statute. We look first to the plain and ordinary meaning of the words to determine if the statute is ambiguous. A statute is clear and unambiguous if its wording is such that reasonable persons are able to agree on its meaning with consistency and predictability. Conversely, a statute is ambiguous if it is found to be vague or uncertain and subject to varying interpretations.

*Michael's Constr., Inc. v. Am. Nat'l Bank*, 2012 WY 76, ¶ 12, 278 P.3d 701, 705 (Wyo. 2012), quoting *Office of State Lands and Invs. v. Mule Shoe Ranch, Inc.*, 2011 WY 68, ¶ 13, 252 P.3d 951, 954-55 (Wyo. 2011). The determination of whether a statute is clear or ambiguous is a matter of law for the court. *Id*. When the language is clear, we give effect to the ordinary and obvious meaning of the words employed by the legislature. *Id*. In ascertaining the meaning of a statutory provision, all statutes relating to the same subject or having the same general purpose must be considered *in pari materia* and construed in harmony. *Id*. We do not apply our rules of statutory construction unless a statute is ambiguous. *Vogel v. Onyx Acceptance Corp.,* 2011 WY 163, ¶ 24, 267 P.3d 1057, 1064 (Wyo. 2011).

[¶19] Greencore argues the district court misconstrued the statute when it applied the definition of fair market value in § 1-26-704, which allows consideration of the prices paid for comparable easements, to a partial taking. As reflected above, § 1-26-702(a) provides that the measure of compensation for all takings of property under the Act is fair market value as defined in § 1-26-704, "except as provided in subsection (b)." Subsection (b) states the measure of compensation for a partial taking is the greater of the value of the property taken or the diminution in value of the remaining property. Greencore reads "except as provided in subsection (b)" to mean § 1-26-704's definition of "fair market value" applies only in cases of complete takings and not in the context of a partial taking.

[¶20] Considering all of the relevant statutes *in pari materia* as we are required to do, we begin our analysis with § 1-26-701(a) which provides that "an owner of property or *an interest in property* taken by eminent domain is entitled to compensation determined under the standards prescribed by W.S. 1-26-701 through W.S. 1-26-713." (Emphasis added.) Pursuant to the clear language of that provision, compensation for a taking is determined as prescribed by the entire act including § 1-26-704, which defines fair market value. Nothing in the language of § 1-26-701, or for that matter § 1-26-704, suggests that the definition of fair market value found in the Act applies only in the context of complete takings and not to partial takings.

[¶21] Moving to the next provision, § 1-26-702(a) plainly states that compensation "for a taking of property" is its fair market value as determined under § 1-26-704, "except as provided in subsection (b)." Again, the language of § 1-26-702(a) does not suggest it applies only to complete takings; rather, it plainly refers to "a taking of property." Had

8

the legislature intended subsection (a) to apply only to complete takings, we presume it would have said so. *See Morris v. CMS Oil and Gas Co.,* 2010 WY 37, ¶ 28, 227 P.3d 325, 333 (Wyo. 2010) (stating "the omission of words from a statute is considered to be an intentional act by the legislature and we will not read words into a statute when the legislature has chosen not to include them.").

[¶22] Section 1-26-702(b) provides that if there is a partial taking, the measure of compensation is either the value of the property rights taken or the amount by which the fair market value of the entire property is reduced by the taking, whichever is greater. Nothing in that language suggests the legislature intended the definition of fair market value found in § 1-26-704 to be inapplicable in the case of a partial taking. In fact, the legislature's use of the term "fair market value" in subsection (b) suggests the contrary.

[¶23] What distinguishes partial takings, and thus explains the phrase "except as provided in subsection (b) of this section", is that there are two alternative ways of figuring compensation when there is a partial taking—the value of what is taken *or* the decreased value of what remains after the taking. As stated in § 1-26-702(b), the greater of those two amounts is the measure of compensation. Reading subsection (a) together with subsection (b) in this way gives both provisions meaning.

[¶24] Reading the provisions this way also gives recognition to the fact that in some cases a partial taking may not reduce the value of the remaining property, at least according to some generally accepted appraisal techniques. By offering an alternative method for measuring just compensation when there is a partial taking which does not result in a reduction in value of the remaining property, the legislature assured a property owner would at least receive compensation for the value of the land taken. *See* Uniform Laws Annotated, Eminent Domain Code, § 1002, 13 U.L.A. 89, comment (2002). In either case, however, the legislature provided only one method for determining value and that method is found in §1-26-704.

[¶25] Were we to accept Greencore's argument that § 1-26-704 does not apply to partial takings, the terms "value" and "fair market value" in subsection (b) would be left undefined. If fair market value is determined in accordance with § 1-26-704 *only* in the case of a complete taking, then how are "value" and "fair market value" determined in the case of a partial taking? Greencore provides no answer and we can conceive of no reason the legislature would provide a method for determining value in one situation and not the other.

[¶26] Greencore also contends the phrase "value of the property rights taken" in § 1-26-702(b) means something other than fair market value. "Value" is defined as "1: a fair return or equivalent in money, goods, or services for something exchanged; 2: the monetary worth of a thing: MARKET PRICE." *Merriam-Webster's Dictionary* 547 (New Edition 2005). Giving the word "value" its plain and ordinary meaning, we are

persuaded the legislature intended it to mean fair market value. Again, ascribing a different meaning to the word "value" as it is used in § 1-26-702(b) would require us to conclude the legislature intended § 1-26-704's definition of fair market value to be used to determine value when an entire parcel is taken, but gave no guidance for determining "value" when only part of a parcel is taken. We will not interpret statutory language to reach an absurd result. *Mule Shoe,* ¶ 19, 252 P.3d at 956. Interpreting § 1-26-702 as Greencore advocates would do just that.

[¶27] Greencore's interpretation also raises questions concerning the legislature's amendment to § 1-26-704 to add subsections (a)(iii)(A), (B) and (C). The new provisions require the use of generally accepted appraisal techniques in determining fair market value and allow consideration of various factors, including "the price paid for other comparable easements . . . of comparable type, size and location on the same or similar property." Section 1-26-704(a)(iii)(B). Nothing in the language of the amendment suggests that it applies only in the context of complete takings and not to partial takings and we can discern no reason the legislature would have intended the amendment to apply only to complete takings. Why, for example, would it require the use of generally accepted appraisal techniques to determine the value of a property in a complete taking but not a partial taking? If it intended to allow consideration of the price paid for comparable easements in the case of a complete taking, what possible rationale would there be for not allowing consideration of the same evidence when only part of parcel is taken? If the legislature intended the amendment to apply only to complete takings, how did it intend the value to be determined when part of a property is taken? Greencore provides no answers to these questions. We conclude § 1-26-704's definition of fair market value applies to both complete and partial takings.

[¶28] In deciding the legislature intended fair market value to be the measure of compensation whether all or only part of a property is taken, we note that we have found no case, and Greencore has pointed us to none, in which the value of condemned property has been measured other than by market value. Although the terminology varies (the measure is sometimes stated as "fair market value," "cash market value," "fair cash market value," or "reasonable market value"), market value appears to be the most frequently used standard for measuring just compensation, regardless of the label. *Coronado Oil Co. v. Grieves*, 642 P.2d 423, 433 (Wyo. 1982).

[¶29] Even if we were to conclude the statutory language was ambiguous, we would reach the same conclusion as to the legislature's intent using our accepted rules of statutory construction. Those rules include consideration of the "mischief the statute was intended to cure, the historical setting surrounding its enactment, the public policy of the state, the conclusions of law, and other prior and contemporaneous facts and circumstances." *Vogel,* ¶ 24, 267 P.3d at 1064.

[¶30]  The rationale for adopting the Eminent Domain Act and subsequent amendments has been stated as follows:

> Impetus for the extensive changes came from increased use of eminent domain proceedings by public utilities and energy related industries, a void in the Wyoming eminent domain law perceived by landowners as allowing abuse of eminent domain by nongovernmental entities, and accelerating market values of land, making one-time payments for compensation less satisfactory.

M. Micheli and M. Smith, *The More Things Change, the More Things Stay the Same:  A Practitioner's Guide to Recent Changes to Wyoming's Eminent Domain Act*, 8 Land & Water L.Rev. No. 1, (2008), quoting R. Lang, Comment, *Wyoming Eminent Domain Act: Comment on the Act and Rule 71.1 of the Wyoming Rules of Civil Procedure*, 18 Land & Water L.Rev. 739, 739 (1983).  Additionally, by adopting the Eminent Domain Act, the legislature obviously intended to cure the mischief it perceived had resulted when just compensation for condemned property was measured using only the before and after value of the remaining property.  *See generally*, *L.U. Sheep Co. v. Bd. of County Comm'rs of the County of Hot Springs*, 790 P.2d 663 (Wyo. 1990); Section 1-26-702.

[¶31]  At the time the Eminent Domain Act was adopted, there existed a number of court decisions addressing the type of evidence that should be considered in determining just compensation in condemnation actions.  As these cases demonstrate, the law in Wyoming has long been that evidence of sales of property comparable to the condemned property is admissible to establish value.  In *State Highway Comm'n v. McNiff*, 395 P.2d 29 (Wyo. 1964), this Court considered whether the district court erred in admitting evidence of sales of subdivided property within city limits to demonstrate the fair market value of condemned property which was outside the city and not subdivided.   The Court concluded the evidence was properly admitted.  *Id.* at 31.  In *Routh v. State Highway Comm'n*, 402 P.2d 706 (Wyo. 1965), this Court reiterated the rule that evidence of sales of similar property in the vicinity of condemned property is admissible to prove the value of the property taken.  *Id.* at 709.

[¶32]  The Court in *State Highway Comm'n v. Joe Miller Land Co.*, 467 P.2d 450 (Wyo. 1970), concluded the district court properly excluded evidence of the sale of allegedly comparable property because an adequate foundation had not been laid for its admission.  *Id.* at 454.  Implicit in the Court's holding, however, is that evidence of comparable sales is admissible when a proper foundation is laid.  Accordingly, in *Reed v. Wadsworth*, 553 P.2d 1024 (Wyo. 1976), the Court upheld the admission of an appraisal based upon sales of comparable land and reiterated that once a proper foundation is laid as to the similarity of properties, courts "should consider all relevant evidence of market value, including

11

other sales of the same or similar property, which were transacted reasonably close in time and distance and under comparable market conditions." *Id.* at 1036.

[¶33] Although our case law makes clear that consideration of evidence of comparable sales is appropriate in determining value in complete takings cases, the propriety of such evidence in cases of partial takings was not as clear prior to the adoption of the Wyoming Eminent Domain Act in 1981. *Continental Pipe Line Co. v. Irwin Livestock Co.,* 625 P.2d 214 (Wyo. 1981), summarized a long line of cases dating back to 1934, reversed a jury verdict that assessed damages based upon the price per rod and held the proper measure of damages for a partial taking was the before and after value of the entire parcel. *Coronado,* 642 P.2d 425, another case decided on the law that existed before the adoption of the Eminent Domain Act, continued to apply the "before and after value of the entire parcel" measure of damages. In *Coronado*, the Court reversed a jury award based on "speculative" evidence intended to show the value of another easement in the area because the award was not related to the before and after value of the entire parcel and the proposed comparable easement did not reflect an arms' length transaction. The evidence in *Continental* and *Coronado* showed little change in the before and after appraised values of the properties remaining after the takings.

[¶34] As originally enacted, the Eminent Domain Act included the current version of § 1-26-702(b) providing that, when there is a partial taking, the measure of compensation is the greater of the value of the property rights taken or the amount by which the fair market value of the entire property before exceeds the fair market value of the remainder after the taking. The Act at that time defined fair market value as:

### § 1-26-704. Fair market value defined

(a) Except as provided in subsection (b) of this section:
(i) The fair market value of property for which there is a relevant market is the price which would be agreed to by an informed seller who is willing but not obligated to sell, and an informed buyer who is willing but not obligated to buy;
(ii) The fair market value of property for which there is no relevant market is its value as determined by any method of valuation that is just and equitable[.][6]

(Supp. 1982).

---

[6] In 2007, the legislature added language requiring use of generally accepted appraisal techniques in determining fair market value and allowing consideration of the price of comparable easements in making the determination. See Paragraph 17, *supra*.

12

[¶35]  This Court interpreted these provisions of the Eminent Domain Act in the context of a county petition to condemn an existing private road for public use in *L.U. Sheep Co.*, 790 P.2d 663.  The question before us was whether the district court had properly instructed the jury on the measure of damages for a partial taking under the Wyoming Eminent Domain Act.  Citing § 1-26-702(b), we held:

> [T]he landowner whose property is the subject of a partial taking is entitled to prove not only the difference between the fair market value of the property prior to the taking and the fair market value of the remainder after the taking, under the "before and after rule," but he is also entitled to prove the value of the property rights taken.  The measure of compensation is the greater of those alternative amounts.

*Id*. at 671.

[¶36]  Citing § 1-26-704(a)(ii), we further held "the landowner may prove the fair market value of the  property taken by any method of valuation that is just and equitable if there is no relevant market establishing the value."  *Id*. at 671-72.  We said the "effect of [the] statutory scheme is to permit the landowner to establish the appropriate amount of just compensation for a partial taking by any rational method so long as he is able to introduce competent evidence to that end."  *Id*. at 672.  The L.U. Sheep Co. and other private landowners had attempted to prove damages from the public use of the road as provided in Wyo. Stat. Ann. § 1-26-706 (Supp. 1982).[7]  Because the district court had instructed the jury only on the "before and after rule" and not in accordance with the language of § 1-26-702(b) allowing a landowner to alternatively prove "the value of the property rights taken," we reversed and remanded the case for a new trial.  In doing so, we gave full effect to the new statute and specifically rejected prior precedent, including *Coronado,* to the extent it was inconsistent with the legislative policy established in the Eminent Domain Act.  *L.U. Sheep Co.*, 790 P.2d at 669-72.  We concluded the legislature had "implicitly abrogated earlier contrary decisions in the law of eminent domain." *Id*. at 669.

---

[7] Prior to 2007, § 1-26-706 provided:

**Compensation to reflect project as planned**

(a) If there is a partial taking of property, the fair market value of the remainder on the valuation date shall reflect increases or decreases in value caused by the proposed project including:
(i)  Impairment of the use of his other property caused by the condemnation; and
(ii) The increase in damage to his property by the general public which could reasonably be expected to occur as a result of the proposed actions of the condemnor;
(iii) Any work to be performed under an agreement between the parties.

13

[¶37] The legislature has had twenty-three years since we applied § 1-26-704 to a partial taking in *L.U. Sheep Co.* to change the statute if our interpretation was contrary to legislative intent. "If this Court had incorrectly interpreted the legislature's intent, 'legislative action to clarify the statutes and correct the court's decision would seem a likely result.'" *Crago v. Bd. of County Comm'rs of Crook County,* 2007 WY 158, ¶ 17, 168 P.3d 845, 854 (Wyo. 2007), quoting *Albertson's, Inc. v. City of Sheridan,* 2001 WY 98 ¶ 21, 33 P.3d 161 (Wyo. 2001). The fact that the legislature has not acted to clarify the statute or correct our interpretation of it in *L.U Sheep Co.* is especially persuasive in this case because the legislature conducted a thorough review of the eminent domain statutes in 2007 and revised them without affecting our holding in *L.U. Sheep Co.*

[¶38] While the law regarding the measure of damages for partial takings in eminent domain was developing, the same issue was being considered in the context of private roads under Wyo. Stat. Ann. §§ 24-9-101 through 104 (LexisNexis 2011). Originally, those statutes provided no guidance on how damages were to be determined in that context. In *Lindt v. Murray,* 895 P.2d 459 (Wyo. 1995), this Court held the measure of damages for taking a private road was the difference in value of the entire parcel before and the remaining land after the taking. The statute was ultimately revised consistent with the holding in *Lindt.*[8]

[¶39] It was in that context that we discussed § 1-26-702(b) in *Mayland v. Flitner,* 2001 WY 69, 28 P.3d 838 (Wyo. 2001), an action brought to have the county commission establish a private road under §§ 24-9-101 through 104. Greencore argues *Mayland* effectively overruled *L.U. Sheep Co.* and mandates that only the before and after values of the remaining lands may be considered to establish the value of a partial taking. Greencore misreads, expands, and then misapplies this Court's opinion in *Mayland* to arrive at its conclusion that § 1-26-702(b) cannot result in a value that is greater than the before and after value of the entire property.

[¶40] The appraisers appointed by the county to calculate the damages caused by the taking of Mayland's property were given instructions agreed to by the parties. Those

---

[8] At the time *Lindt* was decided, § 24-9-101 of the private road statutes provided only that the appraisers were "to assess damages" resulting from the road; it did not specify a formula for assessing those damages. Consistent with *Lindt*, the legislature amended § 24-9-101 of the private road statutes in 2000 by adding the following subsection:

> (j) In determining any damages to be suffered by the owner or owners of the lands through which the access shall be provided, the viewers and appraisers shall appraise the value of the property before and after the road is in place. Damages also may include reasonable compensation for any improvements on the lands over which any private road is to be granted which were not paid for and will be used by the applicant.

14

instructions were a "blend" of eminent domain law, even though the eminent domain statutes did not apply to private roads. The instructions specifically included the language of § 1-26-702(b), informing the commission that the measure of damages was the "greater of the value of the property rights taken or the amount by which the fair market value of the entire property immediately before the taking exceeds the fair market value of the remainder immediately after the taking." *Mayland*, ¶ 32, 28 P.3d at 849. The parties presented evidence of the before and after values of the property taken for the private road as well as other damages to the remaining property. *Id.,* ¶ 40, 28 P.3d at 852. The instructions did not require a specific finding of the before and after values of the remaining property and neither the appraisers nor the county commissioners made such a finding. *Id.,* ¶¶ 43-44, 28 P.3d at 852. Instead, in arriving at their valuation, the commissioners and appraisers relied on Mr. Mayland's per acre value of the property taken and damages he alleged were caused to the remaining property. *Id.,* ¶ 42, 28 P.3d at 853. Mr. Mayland appealed, claiming the appraisers' valuation was invalid because it did not set out the before and after values of the remaining property as required in *Lindt. Id.,* ¶ 32, 28 P.3d at 849.

[¶41] On appeal, this Court concluded that additional findings were not required, the parties had stipulated to the instructions, and the record supported the commission's decision. *Id.,* ¶¶ 42-44, 28 P.3d at 853. In the course of reaching this result, we discussed whether the measure of compensation under § 1-26-702(b) was the same as or different than the measure of damages under § 24-9-101(j) of the private road statutes. We suggested the measure of compensation under the two provisions was essentially the same; that is, the measure of compensation under both enactments is the difference between the value of the property before the taking and the value of the property remaining after the taking. We noted the "value of the property rights taken" in the eminent domain statute logically should be encompassed in a properly calculated "before and after" damage appraisal. Implicit in this discussion is the fact that the "value of the property taken" would be greater only if an appraiser found little difference in the before and after value of the entire property. In that situation, the compensation must be at least the value of the property actually taken. *Id.,* ¶¶ 36-38, 28 P.3d at 851-52. That was not the case in *Mayland* as both appraisers included the value of the property taken in the before and after values of the remaining property. So, in that context, there was no difference between the measure of damages under eminent domain statutes and the private road statutes. *Id.,* ¶ 40, 28 P.3d at 852.

[¶42] In what was clearly *dicta,* this Court discussed the jurisprudence governing damages in private road and eminent domain cases and suggested they were similar, and that § 1-26-702(b), adopted in 1981, appeared to be an attempt by the legislature to codify what some courts had called "severance damages." We cited various authorities for the proposition that the term "severance damages" included both the value of the land taken and the diminution in value of the remaining land after the taking. *Id.,* ¶¶ 36-37, 28 P.3d at 851. On its face, that is precisely what § 1-26-702(b) provides. The Court also

15

mentioned that applying different standards in private road cases and eminent domain cases could raise constitutional questions and that all of the standards must be measured by the state constitutional proviso that "due" and "just" compensation must be paid for the taking of private property. *Id.*, ¶ 40, 28 P.3d at 852; Art. 1, §§ 32, 33

[¶43]  In considering the precedential value of *Mayland*, it is important to note the Court was deciding the legality of a county commission's private road decision pursuant to the Wyoming Administrative Procedure Act.  Among other administrative law issues, Mr. Mayland contended the county commissioners' order had failed to include findings of the before and after value of his remaining property and, therefore, the order had to be remanded for such a finding.   The Court reviewed the record and concluded that substantial evidence supported the commissioners' conclusion regarding damages which were more than the per acre value of the land taken for the private road.  In concluding that the omission of specific before and after numbers was not fatal to the commission's decision, the Court found that the instructions, which were agreed to by Mayland, did not require such findings, and the viewers could make reasonable inferences regarding those values from the evidence presented.  *Id.*, ¶¶ 42-43, 28 P.3d at 853.  The county's decision was entered February 1, 2000, before the private road statutes were amended to provide a statutory standard for damages, but after *Lindt* was decided which established a before and after standard for valuation in private road cases.  *Id.*, ¶ 9, 28 P.3d at 842.

[¶44]  A careful reading of *Mayland* confirms that it did not overrule *L.U. Sheep Co.* or hold that damages in a partial taking case are limited to the difference between the before and after values of the remaining property.  There is nothing in *Mayland* which prohibits the court from considering the value of the property taken as directed in § 1-26-702(b) or from using the definition of fair market value under §  1-26-704 in valuing that condemned property interest.

[¶45]  The historical context in which the Eminent Domain Act and its 2007 amendments were adopted  establishes that §  1-26-704's definition of fair market value applies in partial takings cases.  A review of the legislative history, including the floor debate on the 2007 amendments, shows the legislature specifically deliberated on the issue of whether the price paid for comparable easements should be considered in determining fair market value in partial takings cases and chose language stating that it should be.  *See* Debate on House Bill 0124, 59th Leg. Gen. Sess., January 24, 2007, afternoon session. http://legisweb.state.wy.us/2007/audio/AudioMenu/AudioMenu.aspx.  While the intent of individual legislators cannot be considered as reflecting the intent of the legislature as a whole, the fact that the matter was debated and the final legislation included the relevant language does provide evidence of the legislative intent.  *See, e.g.*, *Kennedy Oil v. Dep't of Revenue*, 2008 WY 154, ¶¶ 21-22, 205 P.3d 999, 1006 (Wyo. 2008), citing *Greenwalt v. Ram Rest. Corp. of Wyo.*, 2003 WY 77, ¶ 52, 71 P.3d 717, 735 (Wyo. 2003).  Thus, whether we rely on the plain language of the statute or the rules of statutory construction, we arrive at the same conclusion—the legislature intended the definition of fair market

value in § 1-26-704 to apply in all takings cases, including partial takings for pipeline easements.

[¶46] We recognize there have been scholarly opinions that question the use of comparable sales of other easements as an appropriate method of valuing easements in condemnation cases. For example, Albert N. Allen's article entitled *The Appraisal of Easements* in Vol. 48, No. 6, Right of Way Magazine 40 (Nov/Dec. 2001) opines that other easement transactions should not be used in appraising the impact on the burdened property, contending that such data is unreliable because easements are not economic units in and of themselves; easement sales introduce project influence into the before valuation; easement transactions are complex making comparison difficult; and easement transactions do not involve willing buyers and sellers. *Id.* at 44-45. It has also been suggested that valuation of easements is an inherently difficult task and there is no truly adequate means of accomplishing it. *See* Wayne C. Lusvardi, *The Appraisal of Easements Under the State Rule Separating Fact from Fiction*, Right of Way Magazine, 15 (July/Aug 1996); Comment, *Judicial Battles Between Pipeline Companies and Landowners: It's not Necessarily Who Wins But By How Much*, 37 Hous. L. Rev. 125 (2000). We must assume the legislature was fully aware of these concerns and yet chose to allow the price paid for "comparable easements" to be considered in the determination of fair market value.

[¶47] While § 1-26-704 may appear to contain unique statutory language, it is not without some precedent. New Mexico statutes pertaining to the acquisition of natural gas or petroleum gathering line easements specifically provide for the use of "the cost of acquisition or any contract to acquire comparable easements" in calculating the market value of the property taken for easements. N.M.S.A. § 70-3A-5(B). A New Mexico court of appeals applied the statute and recognized the propriety of using evidence of comparable easements to establish the value of a condemned pipeline easement in *El Paso Field Services Co. v. Montoya Sheep & Cattle Co.,* 77 P.3d 279, 281 (N.M. Ct. App. 2003).

[¶48] Similarly, some other state courts allow the use of comparable easements in valuing pipeline easements in condemnation cases. A Tennessee court of appeals held in *Water Authority of Dickson County v. Hooper,* 2010 WL 1712968 (Tenn. Ct. App. 2010), that evidence of sales of other easements was admissible for the purpose of determining a condemned easement's value, provided they were comparable. In *Bauer v. Lavaca-Navidad River Authority,* 704 S.W.2d 107, 109-10 (Tex. Ct. App. 1985), a Texas court of appeals held evidence of recent easement sales was admissible on the issue of the market value of a condemned pipeline easement as long as the proposed comparables met three tests: "(1) reasonable similarity; (2) not too remote in time and distance; and (3) not compulsory, but free and open." The use of comparable pipeline easement sales was also identified as an appropriate method of determining value in *Atkinson v. Seminole Pipeline Co.,* 1998 WL 193363 (Tex. Ct. App. 1998) (not designated for publication). *See also*,

*Texas Electric Service Co. v. Linebery,* 327 S.W.2d 657, 665 (Tex. Ct. App. 1959) (recognizing admissibility of other pipeline easement sales to establish market value of easement taken provided they meet the test of comparability). In *Exxon Pipeline Co. v. Zwahr,* 88 S.W.3d 623, 630 (Tex. 2002), the Texas Supreme Court recognized the *Bauer* holding which allowed evidence of comparable pipeline easement sales in condemnation valuation cases when a separate economic unit is established but held that such evidence was not appropriate in that case because the Zwahrs' expert improperly included enhancement from the current project in his evaluation.

[¶49]  Wyoming's legislature grappled with the issue of how best to value condemned easements when it amended the Eminent Domain Act in 2007 and made a specific policy choice to allow the use of comparable sales of easements as a tool. Courts should not "usurp the power of the legislature by deciding what should have been said." *Hede v. Gilstrap*, 2005 WY 24, ¶ 6, 107 P.3d 158, 163 (Wyo. 2005). It is not this Court's prerogative to ignore the legislature's policy decision. *See City of Cheyenne v. Bd. of County Comm'rs of the County of Laramie,* 2012 WY 156, ¶ 18, 290 P.3d 1057, 1062 (Wyo. 2012). We must, therefore, apply the statute as written.[9]

[¶50]  The district court correctly concluded § 1-26-704 was applicable in determining the value of Greencore's easement. We consider next the question of whether the district court erred when it rejected Barlow's evidence of other pipeline sales to establish the fair market value of the condemned interest.

## 2. *Arms' Length Nature and Comparability of Easement Transactions*

[¶51]  At trial, in an effort to prove the fair market value of the property taken for Greencore's easement, Barlow introduced evidence showing that between 2002 and 2011 it granted twelve other pipeline easements across its property to various companies. The trial evidence also included easements granted by other landowners on property in the area. Barlow claimed those easements were of comparable type, size and location to the Greencore easement and were, therefore, evidence of the condemned easement's fair market value under § 1-26-704(a)(iii)(B) and (C), which allow use of the "price paid for other comparable easements or leases of comparable type, size and location on the same or similar property" and "values paid for transactions of comparable type, size and location by other companies in arms length transactions for comparable transactions on the same or similar property." In addition, Greencore introduced evidence of what it had paid for easements for its pipeline on other properties. The district court concluded the other easements Barlow relied upon to show the fair market value of Greencore's easement were not arms' length or comparable, but Greencore's easements were

---

[9]  Greencore's expert appraiser, Neal Hilston, recounted criticisms similar to those expressed by the various articles in rejecting comparable easement sales as a means to calculate the fair market value of the Greencore easement over Barlow's property. For the same reasons that it would be improper for this Court to ignore the legislative directive, it was improper for Mr. Hilston to do so.

comparable. Barlow asserts the district court misconstrued the relevant statutory language in concluding its proposed easement transactions were not comparable, erred as a matter of law by reading it as requiring other easements to be of the same "style" [10] as Greencore's easement and improperly determined the transactions were not arms' length.

[¶52] Before we analyze the specific aspects of the district court's decision, it is worthwhile to reiterate the standard of review we set out in Paragraph 14, *supra*. Because the district court held a bench trial, its factual findings are not disturbed unless they are clearly erroneous. With regard to questions of law, however, our review is *de novo*. As a preliminary matter we observe that the district court made some errors of law and this seems to have tainted its factual findings.

### A. Proffered Easements

[¶53] The district court concluded, for various reasons found throughout its decision, the easements presented by Barlow were not arms' length or sufficiently comparable. It did not, however, individually evaluate many of the proposed comparables. We will address the district court's findings and conclusions regarding the easements it considered, but note that each proposed easement transaction should have been evaluated to determine whether it was appropriate evidence of fair market value.

[¶54] Barlow's proffered easements can be summarized as:

| Exh. No. | Parties | Date | Size | Initial Payment Terms | Annual/ Subsequent Payment | Additional Information |
|---|---|---|---|---|---|---|
| D-1 | Barlow/ Thunder Creek | 4/17/02 | 100 foot construction easement/ 50 foot permanent easement 16 inch pipeline | $15 per rod | $7.50 per rod annual | Traverses Barlow property without connecting to facilities |
| D-2 | Barlow/ Bear Paw | 7/25/02 | 100 foot construction easement/50 foot permanent easement | $15 per rod | $7.50 per rod with CPI adjustment | Connects to another pipeline on Barlow's property |

---

[10] The district court misquoted § 1-26-704(a)(iii)(B) in its decision letter by replacing the word "size" with "style."

| | | | 16 inch pipeline | | | |
|---|---|---|---|---|---|---|
| D-3 | Barlow/ Optigas | 2/17/03 | 100 foot construction easement/50 foot permanent easement 16 inch pipeline | $15 per rod initial | $7.50 per rod with CPI adjustment | Connects to receipt point on Barlow property |
| D-4 | Barlow/ Western Gas | 12/6/04 | 75 foot construction easement/30 foot permanent easement 12 inch pipeline | $25 per rod for initial 10 year term | Renewable at same rate with CPI adjustment for additional 10 year terms | Connects with facility on Barlow property |
| D-5 | Barlow/ Bear Paw | 3/21/05 | 100 foot construction easement/ 50 foot permanent easement 16 inch pipeline | $15 per rod | $7.50 per rod annual with CPI adjustment | Connects to receipt point on Barlow property. |
| D-6 | Barlow/ Thunder Creek | 8/1/05 | 80 foot construction 40 foot permanent easement 16 inch pipeline | $15 per rod | $7.50 per rod annual | Runs parallel to D-1 |
| D-7 | Barlow/ Western Gas | 9/8/05 | 75 foot construction 30 foot permanent 12 inch pipeline | $25 per rod for initial 10 year term | Renewable at same rate with CPI adjustment for additional 10 year terms | Runs parallel to D-4 |
| D-8 | Barlow/ Fort Union | 5/23/07 | permanent easement of two 50 foot strips of land two 24 inch pipelines | $50 per rod plus $20 per rod consult-ing fee for loss of | Barlow testified that annual payment calculated with two site leases and was $8.75 with CPI adjustment. | Connects to facility on Barlow property |

| | | | | | | grazing[11] | |
|---|---|---|---|---|---|---|
| D-9 | Barlow/ Western Gas | 5/23/07 | 75 foot construction 30 foot permanent three 12 inch pipelines | $25 per rod for initial 10 year term | Renewable at same rate with CPI adjustment for 10 year terms | Connects to facilities on Barlow property |
| D-10 | Barlow/ Western Gas | 2/27/08 | 75 foot construction 30 foot permanent three 12 inch pipelines | $25 per rod for initial 10 year term | Renewable at same rate with CPI adjustment for 10 year terms | Connects to facilities on Barlow property |
| D-11 | Barlow/ Western Gas | 3/18/09 | 135 foot construction 100 foot permanent two 24 inch pipelines | $30 per rod for initial 10 year terms which included $5 per rod for loss of grazing. | Renewable at $25 per rod with CPI adjustment for 10 year terms | Connects to facilities on Barlow property |
| D-12 | Barlow/ Thunder Creek | 4/20/11 | 60 foot construction easement/30 foot permanent easement 3 inch pipeline | $15 per rod | $7.50 per rod annual with CPI adjustment | Connects existing pipeline to wells on Barlow property |
| E-1 E-2 | Maycock/ CMS | 6/15/99 | 75 foot construction easement/50 foot permanent 24 inch | $25 per rod for initial 15 year term | Renewable for 3 additional 15 year terms at rates which decrease by $5.00 per rod | Traverses Maycock property, paralleling Greencore's easement |

---

[11] Mr. Barlow testified that on a "per pipeline" basis, the consideration was $25 per rod initially plus $10 per rod for consulting/grazing fees. He also stated that the annual payment was negotiated with other site leases and "equated to $8.75 per rod per year for this pipeline."

| | | | | | | |
|---|---|---|---|---|---|---|
| | | | pipeline | | for each term | for some distance |
| E-3 E-4 | Maycock/ Western Gas | 4/29/04 | 50 foot construction 20 foot permanent easement 16 inch pipeline. | $25 per rod for initial 10 year term | Renewable for additional 10 year terms for $25 per rod with CPI adjustment | Traverses Maycock property, paralleling E-1 and E-2 and Greencore's easement |
| E-5 E-6 | Maycock/ Western Gas | 6/6/08 | 85 foot construction 20 foot permanent easement 16 inch pipeline | $25 per rod for initial 10 year term | Renewable for additional 10 year terms for $25 per rod with CPI adjustment | Negotiated with a road easement which required an annual payment |
| F-4 | Nisselius Ranch/ Optigas | 11/18/08 | 70 foot construction 30 foot permanent easement for a 6 inch pipeline | $20 per rod | $10 per rod with CPI adjustment every three years | Connects to another pipeline |
| F-5 | Mankin/ Thunder Creek | 8/2/05 | 80 foot construction 40 foot permanent easement | $15 per rod | $7.50 per rod annual | Pipeline crosses landowner's property |
| F-6 | TLE Ranch/ Thunder Creek | 9/19/11 | 75 foot construction 25 foot permanent easement plastic pipeline | $25 per rod | $5.00 per rod annual | Connects well on landowners' property. |

## B. Arms' Length

[¶55] The district court rejected Barlow's proposed comparable easement transactions, ruling that they were not the result of arms-length or pressure-free negotiations. The district court individually discussed some, but not all, of the proffered easements in its Findings of Fact and Conclusions of Law:

[17]b. The evidence that was presented on the circumstances surrounding the price paid by the gas companies for pipeline easements raises serious issues regarding comparability. For example, easements D-7, D-8, D-9, D-10 and D-11 granted by Barlow Ranch were for the expansion of existing gas pipeline facilities on Barlow Ranch property. To expand its facilities on Barlow Ranch property, WGR Resources had no option but to acquire property from Barlow Ranch. Therefore, this was not an arm's length transaction under *Coronado Oil Co. v. Grieves,* 642 P.2d 423, 433 (Wyo. 1982). Other easements relied upon by Defendants involved gas companies acquiring easements needed for access to gas production. For example, easement D-12 between WGR Asset Holding Company and Barlow Ranch, easement F-4 granted by Nissileus Ranch to Optigas, and easement F-6 granted by TLE Ranch, Inc. to Thunder Creek Gas Services, connected to production on the grantor's property. Once the well site was selected, the gas companies had no option but to obtain easements from Barlow Ranch, Nissileus and TLE. Therefore, these were not arm's length transactions.

c. The prices paid by [Western Gas] to Barlow Ranch for easements after May of 2004 (Easements D-4, D-7, D-9, D-10 and D-11) are based on a settlement agreement reached mid-trial in a condemnation action by WGR Resources against Barlow Ranch. The amount paid to settle a condemnation action is not fair market value and is not admissible. *Colorado Interstate Gas Co. v. Unita Development Co.,* 364 P.2d 655 (Wyo. 1961). Mr. Barlow's testimony that the settlement amount was based on the price [Western Gas] paid Maycock Trusts for a similar easement does not change the fact that the settlement agreement clearly stated that the parties' motivation for agreeing to that price was the desire to settle the lawsuit and avoid attorney fees. Exhibit 9. That settlement, and presumably that motivation, set the price for all subsequent easements between [Western Gas] and Barlow Ranch.

d. The evidence showed that the prices paid by the gas pipeline companies included a premium to avoid condemnation and to keep a good working relationship with the Defendants for both the operation of their existing facilities and for possible future acquisitions.

23

[¶56]   Section 1-26-704 incorporates the principle that fair market value and comparable sales must be based upon arms' length transactions between willing buyers and willing sellers.  Section 1-26-704(a)(i) states:

> (i) The fair market value of property for which there is a relevant market is the price which would be agreed to by an informed seller who is willing but not obligated to sell, and an informed buyer who is willing but not obligated to buy[.]

Similarly, § 1-26-704(a)(iii)(C) states:  "Values paid for transactions of comparable type, size and location by other companies in arms length transactions for comparable transactions on the same or similar property."

[¶57]   The legislature is presumed to act in a thoughtful and rational manner with full knowledge of existing law.  Statutes, therefore, are "to be construed in harmony with the existing law, and as part of an overall and uniform system of jurisprudence" so long as the statutory language does not indicate the legislature intended a change.  *See Redco Constr. v. Profile Prop., LLC*, 2012 WY 24, ¶ 37, 271 P.3d 408, 418 (Wyo. 2012) (citations omitted).   The willing buyer/willing seller and arms' length concepts are longstanding parts of our jurisprudence *See Grommet v. Newman,* 2009 WY 150, ¶ 52, 220 P.3d 795, 815 (Wyo. 2009); *Mule Shoe*, ¶ 20, 252 P.3d at 956.  A transaction is not arms' length if there is "compulsion either on the part of the seller who is obliged to act or on the part of the purchaser, who for personal reasons or necessities, is compelled to pay a higher price than an ordinary purchaser would be willing to pay." 5 Nichols on Eminent Domain, Ch. CT21, § 21.02[5] (Matthew Bender, 3rd ed.).   Nevertheless, "[a]bsent any showing to the contrary, there is a presumption that the sale was an 'arm's-length' transaction and not under compulsion." *Joe Miller Land Co.,* 467 P.2d at 455-56.

[¶58]    It is well settled that prices paid in condemnation actions or under actual threat of condemnation are not proper comparable sales because they are not arms' length transactions. *See, e.g., City of Cheyenne v. Frangos,* 487 P.2d 804, 805-06 (Wyo. 1971); *Colorado Interstate Gas Co.,* 364 P.2d at 659.  This Court recited the following reasons for the rule against allowing such evidence:

> '* * * The rights of an owner to recover just compensation for the taking of his land are not to be measured by the generosity, necessity, estimated advantage, or fear or dislike of litigation which may have induced others to part with the title to their real estate, or to relinquish claims for damages by reason of injuries thereto. It would be equally unwise, unjust

and impolitic to make it impossible for a corporation which has taken land by eminent domain to compromise the claims of one owner without furnishing evidence against itself in the cases of all others who had similar claims. * * *'

*Id.* at 659, quoting 4 Nichols, Eminent Domain, p. 71 (3d ed.). However, the mere fact that property is purchased by one vested with the power of eminent domain does not preclude admission of evidence regarding the sale, provided the transaction was fair. *Frangos,* 487 P.2d at 806. Consequently, just because condemnation was an option for the buyer does not mean the transaction was inherently unfair or necessarily preclude admission of evidence of the sale.

[¶59]  Relying on *Coronado,* the district court seemed to conclude as a matter of law in Paragraph 17(b) that the simple fact the pipelines had to connect to facilities on the landowners' properties meant the sales were not arms' length because they did not involve a willing buyer. Instead, the district court concluded, the buyers were compelled to purchase the easements because of the location of other facilities. *Coronado* involved the condemnation of a road across Grieves' property by Coronado, an oil company. *Coronado,* 642 P.2d at 426. Coronado claimed the district court erred by admitting an access agreement between Grieves and another producer as evidence to establish the amount of just compensation and this Court agreed. We noted that the only access to the drilling site was across Grieves' land so the producer had "no recourse but to pay the demanded price or resort to condemnation. It was obliged to buy. That is not a willing-seller, willing-buyer atmosphere within the rule. It is an agreement reached under threat of condemnation." *Coronado,* 642 P.2d at 439-40.

[¶60]  For two reasons, we conclude the district court in the present case placed too much emphasis on the required location factor referenced in *Coronado.* First, the comparable sale offered in *Coronado* was made "under threat of condemnation" and apparently resulted in an inflated price. As we stated earlier, prices paid in condemnation actions or under actual threat of condemnation are not admissible as comparable sales. *Frangos,* 487 P.2d at 805-06; *Colorado Interstate Gas Co.,* 364 P.2d at 659. The *Coronado* decision specifically states that the rejected easement was made under threat of condemnation, thus falling within the general rule.

[¶61]  The second reason we reject *Coronado's* statement that a sale is not arms' length when the easement is placed in a "required" location is the case was decided on the law existing prior to the adoption of the Eminent Domain Act. As we recognized in *L.U. Sheep Co.,* 790 P.2d at 669, the Eminent Domain Act "implicitly abrogated earlier contrary decisions in the law of eminent domain." In 2007, the legislature specifically authorized consideration of comparable easements in valuing partial takings. Section 1-26-704(a)(iii)(B) and (C). In the context of pipeline easements, the pipeline route is chosen by the project developer and it will often connect to a facility or another

25

pipeline—that is the nature of the business. The location of pipelines, therefore, will be driven by economics, in that the developer will choose the most cost effective route and, in that regard, will make a determination that the location is "required."[12]   When the legislature mandated that only arms' length transactions be considered as comparables, it did so with an understanding of how the mineral industry designs projects and uses the power of eminent domain. We do not believe the legislature intended that a proposed easement be rejected as an appropriate comparable simply because it is part of a larger project or the location chosen by the company was the most expeditious, shortest or most cost effective. If that were true, the project developer would possess nearly unlimited power to determine the location was "required" and most mineral development easements would be excluded as comparables, in direct contradiction of the statutory directive to use comparable easements to establish fair market value.[13]   We conclude the legislature's intent was to use the market for comparable easements as a tool to determine fair market value in pipeline condemnation cases. In order to give effect to that intent, we reject *Coronado's* statement that a transaction is not arms' length simply because the project developer "requires" the easement be placed in a certain location.

[¶62]   We conclude, therefore, the district court erred as a matter of law by ruling that the transactions referenced in Paragraph 17(b) were not arms' length because they were placed in "required" locations. The district court also erred by categorically rejecting the easements across Maycocks' property as comparables on the basis that they were not arms' length transactions because "most" of them were in required locations.

[¶63]   In Paragraph 17(c), the district court also ruled that easements D-4, D-7, D-9, D-10 and D-11 between Western Gas and Barlow were not appropriate comparables because they were executed subsequent to an easement given in settlement of a 2004 condemnation action between the parties. The district court ruled that all of those easements were tainted by the condemnation.

[¶64]   The district court erred as a matter of law in concluding that all the transactions between the parties after a condemnation action were not arms' length. To reiterate, the rule requires actual condemnation or threat of condemnation to bar use as a comparable

---

[12] In fact, the other Greencore pipeline easements which the district court relied upon in valuing the easement across Barlow's property were part of the larger Greencore pipeline project, and the company chose its route so that it would follow existing pipelines. As such, it could be argued the other Greencore pipeline easements were placed in "required" locations.

[13] We recognize that our decision conflicts with statements in the Micheli and Smith law review article discussed above. They stated that a sale of an easement which was necessary for a larger project involves a compelled buyer and, therefore, was not arms' length and could not be used to establish fair market value. M. Micheli and M. Smith, *The More Things Change, the More Things Stay the Same:  A Practitioner's Guide to Recent Changes to Wyoming's Eminent Domain Act*, 8 Wyo. L. Rev. 1, 15 (2008). The only authority they rely upon is *Coronado,* which we have explained does not support that interpretation.

sale. It does not state that all subsequent transactions between parties who were previously involved in a condemnation action are likewise disqualified as comparable transactions. Indeed, if that were the rule, companies would be inclined to pursue condemnation and that certainly is not the intent of the Eminent Domain Act which encourages private negotiations and agreements.

[¶65] Because an incorrect application of law can lead to errors in findings of ultimate fact, the district court's legal error infected its ultimate factual findings. *See, e.g., Brown,* ¶ 40, 141 P.3d at 685-86; *Jackson Hole Mountain Resort Corp.,* ¶ 17, 109 P.3d at 561. The record does not support a finding that the later Western Gas easements offered by Barlow were the result of condemnation actions or under actual threat of condemnation. The easement given in settlement of Western Gas's condemnation action was not offered as a comparable sale by Barlow, although the settlement agreement and easement were presented by Greencore as Plaintiff's Exhibit 9. The easement was for a seventy-five foot construction/thirty foot permanent easement for a twelve inch pipeline and the compensation was $25 per rod for ten years, renewable for additional ten year periods for $25 per rod plus a CPI adjustment.

[¶66] The easements included in the district court's ruling were given in 2004, 2005, 2007, 2008 and 2009 by Barlow to Western Gas. The district court concluded the condemnation action had determined the price for each because the later easements provided the same compensation as the condemned easement. However, the D-11 easement had different consideration than the others, specifying $30 per rod for the initial 10 year term, which included $5.00 for loss of grazing. In addition, both Western Gas and Mr. Barlow testified there was no condemnation or threat of condemnation involved with the later easements. Mr. Barlow stated that the amounts paid by Western Gas subsequent to the condemnation were the same as the settlement amount but were based upon what Western Gas had paid Maycock for a similar easement in April 2004, which was prior to the easement given in settlement of the condemnation action.

[¶67] Furthermore, Mr. Barlow testified that he agreed to less compensation for the D-9 easement than another company had paid for the D-8 easement given on the same date because he felt the price paid by Western Gas for D-9 "was the market" and "a fair price." Western Gas's representative, Ronald Lightley, testified similarly, describing the negotiations as normal and stating that, although he was aware of a prior condemnation action involving Western Gas and Barlow, he did not pay any attention to it. Given the uncontradicted evidence indicating the transactions were fairly negotiated, it was improper for the district court to categorically reject all of the easements given by Barlow to Western Gas after the 2004 condemnation action on the grounds they were not arms' length transactions.

[¶68] In Paragraph 17(d), the district court concluded Barlow's proposed comparables were not the result of arms' length transactions because the gas companies paid Barlow a

"premium" to make it easier to work with him in the future. The court also stated in Paragraph 6 of its decision that some of the easements "were negotiated in an effort to placate Mr. Barlow so future dealings with him would go more smoothly." These are factual findings and we, therefore, apply our clearly erroneous standard of review.

[¶69] The district court did not identify any particular easements or testimony when it made its findings that the companies paid a "premium" to "placate" Mr. Barlow. Mr. Barlow testified that the D-1 through D-12 easements were all freely negotiated, and we are not directed to any evidence showing otherwise. Looking specifically at the easements mentioned by the district court in Paragraph 17(b), as we mentioned earlier, Mr. Barlow testified there was no threat of condemnation during the negotiations for the D-7 easement. He also stated he did not ask for "more money from Western Gas because of the location of the pipeline." In fact, the agreed upon price was Western Gas's initial offer. As we noted above, Mr. Barlow stated the D-8 and D-9 easements were freely negotiated with no threat of condemnation and he felt the consideration for the D-9 easement "was the market" and "a fair price." Mr. Lightley negotiated the D-9 easement for Western Gas. He testified in general about how he approached negotiations with landowners and specifically about the D-9 easement. He stated his general rule for negotiations was "[w]hen you work for companies, you want to get the pipeline right-of-way for the most inexpensive price you possibly can." He said that before he started a negotiation he looked at what his company and other companies had paid for other similar easements and came up with "a range of potential pricing that was acceptable, because you always want to try to negotiate the best deal for the company." Mr. Lightley testified that generally if negotiations were not successful, the company could change the route but he had always been successful in his negotiations. He stated that he never used condemnation as a "tool . . . to force a price or to negotiate with" and had never been involved in a condemnation action. Mr. Lightley testified that, although he was aware of a prior condemnation action involving Western Gas and Barlow, he did not pay any attention to it in his negotiations with Barlow.

[¶70] Mr. Lightley also testified the negotiation for the D-10 easement was "regular" and "what we thought the value was." He discussed the price with company management and "it was offered and it was accepted." Mr. Barlow testified he negotiated the D-11 easement with Mr. Lightley and it was freely negotiated with no threats of condemnation. Mr. Barlow provided the following testimony regarding the negotiations with Thunder Creek for the D-12 Easement:

> Q. Were there any threats of condemnation in connection with this?
> A. No, there weren't.
> . . . .
> Q. Were there any negotiations over this easement for a greater or lesser sum on the part of either party?

28

A.      No, there were not.  I felt that was what the market was; and when [the Thunder Creek representative] came to me, we discussed it; and we had previous agreements with this company; and that's where I felt the market was; and so that's what we agreed to.

Q.      So, basically, the amount that Thunder Creek offered was the amount Barlow Ranch accepted; and the parties discussed this during the course of negotiations.

A.      Yes, that's correct.

Q.      Was it freely negotiated in your opinion?

A.      Yes, it was.

[¶71]   Daniel Werth, a Thunder Creek representative, testified the pipeline associated with Exhibit D-12 had to cross Barlow property and, consequently, the company's options were limited to negotiating with Barlow, condemnation or not doing the project. However, he stated that condemnation was not threatened and Thunder Creek had never used that option.  He testified, in general, that Thunder Creek preferred not to use condemnation because it "does not promote well-being with Thunder Creek in the community," and, because Thunder Creek might have future dealings with the community, it wanted to "keep the peace."  He also stated that the amounts paid by Thunder Creek for easements represented values "currently being negotiated for right-of-ways" by the company's right-of-way agents and represented the "going rate" for "easements of this type."

[¶72]   Exhibits F-4 and F-6 involved other landowners.  Exhibit F-4 was a pipeline easement granted by Nisselius Ranch to Optigas.  Lee Conley, a representative of Optigas, testified by deposition at the trial and stated the price paid for that easement "was based on our experience and past precedence that we understood were set by other companies and for what we had been paying for the rest of our acreages in the this area, or the rest of our right[s]-of-way in this area."  Although he testified that condemnation was an option for Optigas, he was confident that it would not be necessary.  When asked if Optigas would be "willing to pay a little bit more to keep the peace," he stated, "I think we tried to pay market value, but – but we do try to maintain relationships to keep the peace."  He clarified that what he meant by market value was the "going rate" for comparable pipeline easements.

[¶73]   Exhibit F-6 was a pipeline right of way granted by TLE Ranch to Thunder Creek.  Thomas Edwards, the owner of TLE Ranch, testified at the trial that there was no threat of condemnation and the F-6 easement was freely negotiated.  He described the offers and counteroffers made by the parties in arriving at the final amount.  Thunder Creek representative, Mr. Werth, confirmed Mr. Edwards' testimony regarding Exhibit F-6, stating there was no threat of condemnation.

[¶74] Despite this uncontroverted evidence, the district court concluded the easements were not arms' length because the companies paid a "premium" to Mr. Barlow to "placate" and keep a good relationship with him. The evidence described above does not support those conclusions. The company representatives acknowledged the desire to maintain an amicable relationship with landowners; however, we are not directed to any evidence showing that a "premium" was paid to avoid condemnation or to placate Mr. Barlow or other landowners. Moreover, the very fact that the companies were acquiring easements across others' properties means the parties will have an ongoing relationship as they will be utilizing different estates in the same property. A universal rule that such a relationship negates the arms' length nature of the sale would essentially nullify the statute which allows evidence of comparable easements on the same or similar property. We conclude, therefore, the district court's findings that the transactions were not arms' length because the companies paid a "premium" to "placate" Mr. Barlow were clearly erroneous and do not support its decision to reject the easements as comparables.

## B. Statutory Comparability Factors

[¶75] Sections 1-26-704(a)(iii)(B) and (C) set out parameters for using other easements as comparables to determine fair market value:

> (iii)The determination of fair market value shall use generally accepted appraisal techniques and may include:
> . . . .
>    (B) The price paid for other comparable easements or leases of comparable type, size and location on the same or similar property;
>    (C) Values paid for transactions of comparable type, size and location by other companies in arms length transactions for comparable transactions on the same or similar property.

[¶76] The legislature identified factors to be considered in determining whether an easement or lease is comparable to the condemned easement by specifying "comparable type, size and location on the same or similar property." *Id.* Under our rules of statutory interpretation, we start with the plain language of the statute. *Michael's Constr.,* ¶ 12, 278 P.3d at 705. The term "type" is defined as: "a class, kind or group set apart by common characteristics." *Merriam-Webster's Dictionary* 531 (New Edition 2005). Employing that definition, the district court was required to evaluate the similarities and dissimilarities of the condemned easement and the proposed comparable easements and their impacts on the properties they burden to determine if they are of a comparable "type." This analysis could, therefore, consider the purpose of the easements; the construction methods and materials used, in this case, in the pipelines; the term of the easements, i.e., whether perpetual or limited; and any other evidence which comes to bear on whether the two easements and their corresponding pipelines have similar

characteristics. The "size" of the two pipeline easements must be compared in terms of the diameter of the pipelines and the lengths and widths of both the construction and permanent easements. The easements must also be compared in terms of "location on the same or similar property." Thus, the nature and uses of the lands burdened by both the proposed comparable and the condemned easement must be evaluated.

[¶77] In light of our rule that, if possible, we construe statutes in harmony with the existing law, *see Redco Constr.*, ¶ 37, 271 P.3d at 418, we presume the legislature amended § 1-26-704(a) with full knowledge of this Court's decisions holding admissible evidence of "other sales of the same or similar property, which were transacted reasonably close in time and distance and under comparable market conditions." *Reed*, 553 P.2d at 1036. We likewise presume the legislature amended the provision with knowledge of this Court's statements that no general rule exists as to the degree of similarity required between other property and the property at issue. "It is axiomatic that comparable sales are not and never can be 'identical' to the subject property, since no property can physically be in the exact same location as another property." 7A Nichols on Eminent Domain, Chap. G13, § G13.02[2] (Matthew Bender, 3rd ed.). Value must be determined by "making adjustments for prices of those [comparables] that are more similar or dissimilar to condemned property." *Frangos*, 487 P.2d at 807.

[¶78] The district court concluded the proffered easements were not comparable to Greencore's easement for the following reasons:

> 10. All of the easements the Defendants presented as "comparable" to the easements obtained in this case were for natural gas pipelines. The evidence did not establish that the anticipated life and usefulness of natural gas pipelines and production is similar to the proposed carbon dioxide pipeline in this case. To the contrary, the evidence showed that the anticipated life and production of gas in coal bed methane fields is substantially less than what is anticipated for the carbon dioxide pipeline in this case. Those shorter anticipated terms make "annual" or "renewal" payment terms inapplicable in determining the value of the interest being taken in this case. The evidence did not establish that the economics of natural gas production were comparable to the economics of enhanced oil recovery through carbon dioxide injection.

[¶79] Instead of evaluating the proposed comparables using the statutory factors, the district court compared the economics of Greencore's business with the economics of the methane gas production business. The law is well established that the value of property taken is determined by the loss to the owner not the gain to the taker. *See, e.g.*, 4 Nichols

on Eminent Domain, Ch. 12, § 12.03 (Matthew Bender, 3rd. ed). "The just compensation to which an owner is entitled when his property is taken by eminent domain is regarded in law from the point of view of the owner and not the condemnor. In other words, just compensation in the constitutional sense is what the owner has lost, not what the condemnor has gained." *Id. See also, Kimball Laundry Co. v. United States,* 338 U.S. 1, 5, 69 S.Ct. 1434, 1437-38, 93 L.Ed. 1765 (1949) (holding "gain to the taker . . . may be wholly unrelated to the deprivation imposed upon the owner, [therefore] it must . . . be rejected as a measure of public obligation to requite for that deprivation"); *Coronado,* 642 P.2d at 432 (holding damages in condemnation actions are "to be paid for the property taken or damaged"). When the district court referred to the economics of Greencore's business as compared to the natural gas business, it clearly employed an improper point of reference—the value of the property to Greencore, the condemnor/taker.[14]   That was an error of law.

[¶80]  It appears that the district court did attempt to evaluate the proposed comparables on the basis of "type" in Paragraph 17(a) of its decision:

> a.      Section 1-26-704(a)(iii)(B) requires that the easements relied upon are of a comparable type. The Court finds that the easements relied upon by Defendants are all high pressure gas pipelines which contain flammable materials. . . .
>
> The Greencore pipeline is 232 miles long, carries carbon dioxide, which is a waste product, and does not connect to any of the facilities on Defendants' property. . . .
> . . . .

[¶81]  The record does not support the district court's conclusion that CO2 and natural gas pipelines are not comparable in terms of type. The trial evidence established that the natural gas and carbon dioxide pipelines were essentially the same. Mr. Barlow testified he had witnessed the installation of natural gas pipelines and Greencore's carbon dioxide pipeline on his property. They were all high pressure steel lines and were constructed by

---

[14] Greencore seems to concede this error in its reply brief in its cross appeal, although in a slightly different way:

> [T]he Trial Court focused on the difference between Greencore's use of the land it acquired and the gas companies' use of the land they acquired. This analysis has nothing to do with fair market value of the ranchland acquired by Greencore. Instead, this analysis focused on the economic benefits   and other gains to companies who acquired the land, not the loss of ranchland suffered by Barlow.

the same companies using the same types of construction techniques. Photographs which were admitted into evidence showed the lines were similar. Mr. Maycock and another area landowner, John Mankin, also testified that the Greencore pipeline was similar in construction to the natural gas pipelines on their properties.

[¶82] Without elaboration, the district court also mentioned that natural gas is flammable, while carbon dioxide is not. There is authority for looking at safety risks and their effect on the value of the property in valuing pipeline easements. *See, e.g., Hoekstra v. Guardian Pipeline, LLC,* 726 N.W.2d 648, 655-56 (Wis. Ct. App. 2006); *Fanning v. Mapco, Inc.,* 181 N.W.2d 190, 197 (Iowa 1970). Although we make no determination on whether such evidence would have been proper in this case, if such evidence were developed it could possibly fall within the determination of whether pipelines carrying different materials were comparable in terms of type. However, other than a brief mention that carbon dioxide is not flammable or hazardous by one of Greencore's witnesses, we are directed to no evidence that a natural gas pipeline is more dangerous or any associated danger was somehow factored into the compensation paid for the proposed comparables. In addition, the evidence demonstrated that (without taking into account annual payments and renewal options) the prices paid per rod for the $CO2$ easements, which averaged $50 per rod, were actually higher than the prices paid for the natural gas easements offered as comparables. This indicates that the particular gas conveyed and any associated safety concerns did not affect the value of the easements. Consequently, on this record, there was no basis for distinguishing between the pipelines on the basis of the product transported and the district court's finding that Barlow's proposed natural gas pipeline easements were not comparable to Greencore's $CO2$ easement on that basis was clearly erroneous.[15]

[¶83] We turn now to the easements the district court did find to be comparable and used to establish value in this case—Greencore's other easements. The Greencore carbon dioxide pipeline is 232 miles long; 141 miles of it crosses private and state lands and the remainder crosses federal lands. Greencore was able to obtain easements from sixty-three of the sixty-six landowners the pipeline crosses and paid an average of $50 per rod with no annual payment. Barney Brooks, a representative of Greencore's parent company, testified that the range paid by Greencore was $25 to $75 per rod,[16] with the majority falling between $49 and $55 per rod. With one exception (the Mankin easement), we are not directed to detailed evidence about the other Greencore easements and the lands they crossed. Mr. Brooks testified:

---

[15] Carbon dioxide is considered natural gas for excise taxation purposes. *Amoco Prod. Co. v. State,* 751 P.2d 379, 383 (Wyo. 1988).

[16] Interestingly, Mr. Brooks explained that the higher amounts were paid by Greencore when they "reached a point where it was moving toward condemnation; so we paid a higher – negotiated a higher fixed lump sum to these landowners."

Q. Is the defendant's property generally the same as the other property that Greencore acquired in Wyoming?

A. In respect to terrain or –

Q. Yes, and type of property.

A. Yes, it is, correct.

Q. Yesterday, Mr. Mankin testified, and he mentioned that Greencore acquired an easement from him. Do you recall that testimony?

A. Yes.

Q. And do you recall what Greencore paid Mr. Mankin for his easement[]?

A. As I recall, we paid him $35 per rod.

Q. No annual payments[?]

A. No annual payment.

Mr. Brooks later stated, in response to a question from the judge about the similarities and dissimilarities between the other properties crossed by the Greencore pipeline and Barlow's property, that "[i]t appears to be the same use in the area of general farm land." In response to the judge's prompting, he corrected himself and described the land as "ranch land."

[¶84] The district court relied on the average price Greencore paid for its other easements in awarding Barlow compensation of $50 per rod with no annual payment. The district court's methodology was improper as a matter of law. Other than the Mankin easement, we are not directed to any evidence of the specific similarities and dissimilarities between the condemned easement and the other easements crossed by the Greencore pipeline. Mr. Brooks' general statement that the lands were similar was not sufficient given the total length of the pipeline and the potential diversity of the land it crosses. To rely on comparable easements under § 1-26-704(a)(iii)(B), the easements need to be compared in terms of type, size and location. We also note that using an average of other comparables is not a proper way of calculating fair market value. *Frangos,* 487 P.2d at 807. Instead, fair market value based on comparable sales is determined by "making adjustment for prices of those [comparables] that are more similar or dissimilar to condemned property." *Id.* More information was provided regarding the Greencore easement on Mankin's property. Mr. Mankin testified that his property was directly east of Barlow's property and was similar in nature. On remand, the district court may consider whether the Mankin/Greencore easement was a proper comparable under the statute.

[¶85] In summary, we conclude the district court applied incorrect legal principles and committed clear error in rejecting Barlow's proffered easements and accepting the average Greencore paid for its other easements. Remand is required for application of the correct principles.

34

### 3. *Permissibility Under Wyoming Law of Annual Payments for a Condemned Easement*

[¶86]  Many of the easements offered into evidence by Barlow as comparables included an initial payment and subsequent annual payments, some of which included a CPI adjustment, or terms allowing renewal of the easement with similar adjustments.  The district court ruled, as a matter of law, "[a]nnual payments for a condemned easement are not provided for in Wyoming's statutes.  Wyoming law anticipates a valuation at a specific date, not an unknown valuation dependent on the life of a gas field or a pipeline."  Barlow argues the district court erred by ruling that Wyoming law does not permit annual payments, while Greencore maintains the law requires a fixed lump sum award.

[¶87]  Wyoming statutes do not directly address whether annual payments are allowed; however, looking at various sections of the Eminent Domain Act and considering them *in pari materi* in accordance with our statutory interpretation rules provides insight into whether the legislature intended that annual payments be allowed.  As we have explained, the overarching intent of the Act is to provide just compensation, as reflected by fair market value, to the condemned landowner.  Section 1-26-702.  That goal is, therefore, the touchstone we must utilize in determining whether the statutes contemplate allowing annual payments.

[¶88]  Section 1-26-704 provides methods for determining fair market value, with subsection (a)(iii)(B) specifically allowing consideration of the "price paid for other comparable easements or leases."  Leases are, of course, paid on an on-going basis during a term.  *See, e.g.*, *Laramie Citizens for Good Government v. City of Laramie,* 617 P.2d 474, 479 (Wyo. 1980) (noting one of the factors in determining whether a transaction is a lease is the inclusion of a provision for cancellation of the lease by the lessee at its option at yearly intervals, or the converse provision that the term is for one year with yearly renewal options).  Because leases are specifically listed as appropriate comparables and are generally paid based on the actual time the property is leased rather than a fixed lump sum, the implication is that annual payments could be considered by the court in determining appropriate compensation.

[¶89]  Wyo. Stat. Ann. § 1-26-514(b) (LexisNexis 2011) provides:  "The court in determining due compensation may authorize a lump-sum payment or an annual installment or amortization payment to continue throughout the term of the easement."  Barlow maintains this provision essentially authorizes annual payments and indicates a total lump sum payment need not be fixed at the conclusion of the condemnation action.[17]

---

[17] Barlow's expert witness testified that lump sum amounts are not required by generally accepted accounting practices.  He said that value can be "stated in any terms that are of a financial nature," which may include "an initial payment per rod and then periodic payments for the life of the pipeline, with periodic CPI adjustments."

Greencore argues this provision does not support on-going annual payments because the concepts of amortization and installment payments are based on the fixed amount that is simply paid over time. While we agree that amortized or installment payments are often based upon a total lump sum amount, § 1-26-514(b) specifically states that the payment can "continue throughout the term of the easement." With a perpetual easement that does not end until abandoned, the total number of years the easement will be used would have to be known in order to amortize or calculate installments and, given that the period could vary depending upon the condemnor's actual use, the provision suggests annual payments could be allowed without setting a fixed amount.

[¶90] Wyo. Stat. Ann. § 1-26-509 (LexisNexis 2011) gives parameters for the condemnor to engage in required good faith negotiations with the landowner prior to filing a condemnation action and provides in relevant part:

> (a) A condemnor shall make reasonable and diligent efforts to acquire property by good faith negotiation.
> (b) In attempting to acquire the property by purchase under W.S. 1-26-510,[18] the condemnor, acting within the scope of its powers and to the extent not otherwise forbidden by law, shall negotiate in good faith and may contract with respect to:
> (i) Any element of valuation or damages recognized by law as relevant to the amount of just compensation payable for the property;
> (ii) The extent, term or nature of the property interest or other right to be acquired;
> . . . .
> (vi) The time and method of payment of agreed compensation or other amounts authorized by law; and
> (vii) Any other terms or conditions deemed appropriate by either of the parties.

---

[18] Wyo. Stat. Ann. § 1-26-510 (LexisNexis 2011) states:

> (a) Except as provided in W.S. 1-26-511, an action to condemn property may not be maintained over timely objection by the condemnee unless the condemnor made a good faith effort to acquire the property by purchase before commencing the action. A condemnee may not object to the good faith of the condemnor if the condemnee has failed to respond to an initial written offer as provided in W.S. 1-26-509(c)(iii)(E) and the condemnor has met the requirements of W.S. 1-26-509(c).
> (b) Negotiations conducted in substantial compliance with W.S. 1-26-509(b) through (e) are prima facie evidence of "good faith" by the condemnor under subsection (a) of this section.

36

[¶91] Subsections (b)(vi) and (vii) give the parties the option of negotiating and contracting for the "time and method of payment of agreed compensation" and on "[a]ny other terms or conditions deemed appropriate" by them, while subsections (b)(i) and (ii) allow the parties to negotiate and contract on "any element of valuation or damages recognized by law as relevant to the amount of just compensation payable for the property" and specifically reference the "extent, term or nature" of the interest being acquired by the proposed condemnor. These provisions all indicate that the compensation which can be negotiated by a potential condemnor and a condemnee could include a wide variety of measures, including annual or on-going payments during the actual term of the easement. Given that broad authority, it would stand to reason that in determining compensation when good faith negotiations are not successful, the district court could award on-going payments if the evidence supported it.

[¶92] On the other hand, Wyo. Stat. Ann. § 1-26-703 (LexisNexis 2011) provides that the date of valuation of condemned property is "the date upon which the condemnation action was commenced." Greencore maintains this provision requires a one-time lump sum payment. The provision does not, however, state that; it simply provides that the valuation must be made on a date certain. If the valuation includes an on-going payment as valued on the statutory date, then it would meet that requirement. Similarly, we do not read that section as prohibiting a consumer price index adjustment. The CPI adjustment is based on the United States Bureau of Labor Statistic's calculation of the change over time of prices paid for goods and services. http://www.bls.gov/cpi/cpifaq.htm#Question_1. The use of an annual payment with a CPI adjustment recognizes the time value of money. If an annual payment is allowed, the condemnor will not be paying the full value of the easement up front and will, therefore, be able to enjoy the benefit of those funds. The CPI adjustment simply equalizes the dollar value over time to provide full compensation to the landowner. Although the amount will change over time, its parameters will be fixed at the time of the condemnation award.

[¶93] Section 1-26-513(a) requires the condemnor to deposit, at the time of commencing an eminent domain proceeding, "an amount equal to the condemnor's last offer of settlement prior to the action." Greencore argues that such deposit would be impossible if the negotiations included an annual payment because the length of the easement term and the total of the annual payments which will be due are not known. *See also*, W.R.C.P. 71.1(l) (addressing deposit of "any money or bond required by law as a condition to the exercise of the power of eminent domain"). We agree that this provision works better with a fixed sum than with an annual payment provision. However, the provision also contemplates that the amount can be adjusted as necessary. Section 1-26-513(a). Moreover, § 1-26-513 does not pertain to the calculation of fair market value and is simply meant to provide security during the course of the condemnation proceeding. The fact that the legislature did not provide specific guidance to calculate a correct deposit when a recurring payment is offered does not mandate an interpretation that such

37

payment is never allowed. While depositing the correct amount may require some estimation as to the useful life of the easement, the provision does not expressly prohibit the use of annual payments as part of a just compensation award.

[¶94] Considering the clear language of the many provisions of the Eminent Domain Act together, we conclude the legislature did not expressly limit awards in condemnation actions to lump sum amounts or prohibit annual payments. The language indicates the court has broad authority to tailor damages to fulfill the Act's overall intent to provide just compensation, based on fair market value, to the condemned property owner.

[¶95] We would reach the same result if we concluded the statutes are ambiguous and applied rules of statutory construction, including looking at the historical context of the Eminent Domain Act and legislative history. As we mentioned earlier, part of the impetus for adopting the Eminent Domain Act was the fact that one-time payments as compensation for takings were not satisfactory. R. Lang, Comment, *Wyoming Eminent Domain Act: Comment on the Act and Rule 71.1 of the Wyoming Rules of Civil Procedure*, 18 Land & Water L.Rev. 739, 739 (1983). The historical setting of the act, therefore, confirms that annual payments are allowed. In addition, the legislative history indicates the legislature did not intend to prohibit annual payments. Report No. 1, Eminent Domain Study, Joint Judiciary Interim Committee (April 1979) which was prepared in advance of initial adoption of the Eminent Domain Act, indicates that just compensation could include lump sum payments and annual, lease-type payments which could continue as long as the authorized use is made of the condemned property. *See Kennedy Oil,* ¶ 22, 205 P.3d at 1006 (recognizing legislative committee reports as proper evidence of legislative intent).

[¶96] The district court erred by concluding as a matter of law that annual payments are not allowed by Wyoming statutes. [19] This ruling does not, however, end the inquiry. The record contains evidence of transactions involving annual payments and transactions that do not. On remand, the district court will need to evaluate the evidence to determine whether annual payments are justified in this case.

### 4. *Greencore's Entitlement to Abandon Pipeline in Place*

[¶97] Greencore requested that, as part of the perpetual easement granted in the condemnation action, it be allowed to abandon the pipeline in place when it is finished using the easement. Barlow insisted that Greencore be ordered to remove the pipeline and reclaim and restore the condemned property at the time of abandonment. The district court ruled that Wyo. Stat. Ann. § 1-26-714 (LexisNexis 2011) governs the removal issue

---

[19] Obviously, if we are incorrect in this analysis, the legislature can amend the statute to expressly prohibit annual or periodic payments and require only lump sum awards.

and that statute cannot be applied until the pipeline is actually abandoned. Section 1-26-714 states:

> (a) A condemnor who acquires a property right or interest of less than fee simple title in any land shall be responsible for reclamation on such land and for restoration of the land and any improvements thereon. The reclamation and restoration shall return the property and improvements to the condition existing prior to the condemnation to the extent that reasonably can be accomplished.

[¶98] Greencore insists that, because it is condemning a perpetual easement, it should be allowed to abandon the pipeline in place and cites *Bridle Bit Ranch Co. v. Basin Elec. Power Co-op.,* 2005 WY 108, ¶¶ 52-54, 118 P.3d 996, 1016 (Wyo. 2005), as authority. In *Bridle Bit,* we stated: "As a general rule, easements may be perpetual, or for an indefinite duration, or for so long as they are needed for their intended purpose or so long as the necessity continues." *Id.,* ¶ 53, 118 P.3d at 1016, citing 4 *Powell on Real Property* § 34.19, at 34–179—34–184 (2001); 25 Am.Jur.2d *Easements and Licenses* § 94 (2004).

[¶99] We have no trouble agreeing that a perpetual easement may be condemned. Nevertheless, that does not mean a perpetual easement cannot be abandoned. Wyo. Stat. Ann. § 1-26-515 (LexisNexis 2011) states:

> Upon abandonment, nonuse for a period of ten (10) years, or transfer or attempted transfer to a use where the transferee could not have condemned for the new use, or where the new use is not identical to the original use and new damages to the landowner whose property was condemned for the original use will occur, any easement authorized under this act terminates.

Consistent with the statute, the easement given by Barlow to Greencore in this case specifically states that it shall terminate upon the happening of various conditions, including abandonment.

[¶100] Section 1-26-714(a) directly addresses the reclamation responsibility of a condemnor who has acquired less than a fee simple title in the property and states it "shall be responsible for reclamation on such land and for restoration of that land[.]" The statutory provision also states that property shall be returned to the "condition existing prior to the condemnation to the extent that reasonably can be accomplished." There is no indication in the statutory language that the reclamation responsibility does not apply if the easement granted is perpetual.

[¶101] Greencore also argues that § 1-26-714 only applies if the pipeline is removed and does not prohibit the condemnor from leaving the pipeline in place. That interpretation of the statute does not take into account the language requiring the condemnor to return the property and improvements to "the condition **existing prior to the condemnation**." (emphasis added). The condition existing prior to the condemnation was no pipeline under the ground on the landowner's property. Greencore also argues that by imposing a removal requirement, the condemnation award is unfairly inflated to greater than the value of the underlying property and the property interest taken. Greencore's interpretation ignores § 1-26-714(d) which allows the condemnor and condemnee to agree "to compensation in lieu of the obligations provided in [the reclamation and restoration] section." That provision clearly indicates the compensation for reclamation is separate from, and in addition to, the compensation for the taking.[20]

[¶102] As the district court recognized, however, the condemnor's reclamation responsibility is limited to what is "reasonable." Greencore contemplates that the pipeline will be in use for many years and, thus, what will be reasonable at the time of abandonment is not known at this time. At the time of abandonment, it may be determined that it is unreasonable to require removal at all; measures short of removal are sufficient to reclaim the property; or removal and full reclamation is required. Those determinations simply cannot be made presently. The district court properly ruled that the issue of whether removal of the pipeline at the time of abandonment will be required is not appropriate for judicial consideration at this time.

**CONCLUSION**

[¶103] Wyoming law specifically provides for use of comparable sales of easements to determine the fair market value of a condemned easement. The district court, however, applied incorrect legal standards and committed clear error when it concluded none of Barlow's proposed easement transactions were comparable. The district court did not follow the proper methodology in determining whether the transactions were arms' length or the other easements were of comparable type, size and location. On remand, the district court should analyze the proffered easements to determine whether they are comparable under the appropriate standards. The analysis may consider the comparables as substantive evidence of fair market value and/or as a basis for Barlow's appraiser's calculation of fair market value. In determining the fair market value, the district court will need to address the similarities and differences between the individual comparables

---

[20] Section 1-26-706 (a) states that the increase or decrease in value to the remainder resulting from an agreement as to any reclamation work is to be included in the fair market value determination: "If there is a partial taking of property, the fair market value of the remainder on the valuation date shall reflect increases or decreases in value caused by the proposed project including: . . . (iii) Any work to be performed under an agreement between the parties or pursuant to W.S. 1-26-714." The change in value of the remaining property is different from the cost of the reclamation itself.

40

and the Greencore easement. As we stated in *Frangos*, fair market value based on comparable sales is determined by "making adjustments for prices of those [comparables] that are more similar or dissimilar to condemned property." *Frangos*, 487 P.2d at 807.

[¶104] The district court also incorrectly concluded, as a matter of law, that an annual payment cannot form part of the just compensation in easement condemnation cases. On remand, the district court must conduct a factual analysis to determine whether annual payments are appropriate in this case. Once the proper analysis is done, the resulting award may be higher or lower than the original award of a one-time lump sum in the amount of the average Greencore paid for its other easements. The district court properly concluded the issue of whether Greencore has to remove the pipeline upon abandonment and termination of the easement is not yet ripe for consideration.

[¶105] Affirmed in part and reversed and remanded in part for additional proceedings consistent with this opinion.